734 So.2d 352 (1999)
George Waddell NEVILLE, Appellant,
v.
Tina Foley NEVILLE, Appellee.
No. 97-CA-00860-COA.
Court of Appeals of Mississippi.
February 23, 1999.
*353 Sam Brand, Jackson, Attorney for Appellant.
Ross Barnett, Jackson, Attorney for Appellee.
BEFORE McMILLIN, P.J., KING, AND SOUTHWICK, JJ.
McMILLIN, P.J., for the Court:
¶ 1. George Neville, an attorney, was granted a divorce from his wife, Tina Neville, a medical doctor, in the Chancery Court of Hinds County on the ground of uncondoned adultery. After finding the proof sufficient to grant the divorce, the chancellor turned to the matters of determining child custody and adjudicating the various financial considerations that attend the dissolution of a marriage. He granted primary physical custody of the parties' child to Dr. Neville and Mr. Neville has appealed that decision. Mr. Neville also claims that he was ill-treated by the chancellor in various ways relating to matters of finance and the division of personalty. He also raises two issues regarding perceived errors in evidentiary rulings by the chancellor.
¶ 2. Dr. Neville has filed a cross-appeal, claiming that the chancellor was unduly generous to Mr. Neville in awarding him $1,400 per month for a fixed term of 120 months in an award the chancellor termed rehabilitative alimony. Dr. Neville also suggests that the chancellor abused his discretion in setting child support to be paid by Mr. Neville below the applicable statutory guidelines without offering adequate justification for doing so.
¶ 3. We conclude, based upon our review of the record and the applicable law, that the chancellor acted within the range of discretion given in such matters in all aspects of his ruling, and we, therefore, affirm *354 the judgment, subject only to a change we make on our own motion in the terminology the chancellor used to describe Mr. Neville's alimony award.

I.

Facts
¶ 4. Mr. Neville and Dr. Neville were married in 1988 at a time when he was working as an attorney for the Office of the Attorney General and Dr. Neville was a medical school student. He was 31 years old and she was 23 years of age at the time of the marriage. A female child was born to the couple in December 1991. In 1995, the couple anticipated moving from Jackson to Long Beach to permit Dr. Neville to begin practicing in her area of specialty. The record indicates that, during this time, Dr. Neville had become romantically involved with a physician from the coast area that ultimately led to an adulterous affair. It was the evidence of this affair that formed the basis of the chancellor's decision to grant Mr. Neville a divorce.
¶ 5. As a result of the marital difficulties brought on by Dr. Neville's adulterous conduct, Mr. Neville did not relocate to Long Beach, though the parties had already purchased a home in anticipation of the move. At the time of the divorce trial, Mr. Neville continued to actively practice law with an income of approximately $55,000 per year. Dr. Neville was earning in the range of $165,000 per year at the time of the separation. The evidence suggests that both parties are healthy and reasonably capable of continuing their respective gainful employment for the foreseeable future.

II.

Child Custody
¶ 6. As his first issue, Mr. Neville urges this Court to conclude that the chancellor abused his discretion in awarding primary physical custody of the parties' daughter to Dr. Neville.
¶ 7. In a contested child custody case, the chancellor is often confronted with a difficult decision. The Mississippi Supreme Court has listed a number of factors that ought properly to enter into the decision process. These criteria have, through long use, come to be familiarly known as the Albright factors. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). The critical issue underlying all the Albright factors is the welfare of individuals that, in the great bulk of cases, are not parties to the litigationnamely, the children of the litigants. The supreme court has stressed this point by saying that the child's best interest is the "polestar" consideration in any custody determination. M.C.M.J. v. C.E.J., 715 So.2d 774(¶ 11) (Miss.1998). Thus, though the dispute is between the litigants, the determination of custody does not particularly concern itself with the parents' competing claims that to deprive one or the other of custody would be unduly harsh to that parent. It is for that reason, for example, that the party causing the dissolution of the marriage may, nevertheless, prevail in the resulting custody dispute, the courts reasoning that an award of custody is not a proper means to punish an offending spouse. McKee v. Flynt, 630 So.2d 44, 49 (Miss.1993).
¶ 8. In this case, the chancellor was presented with an abundance of testimony as to which parent could best meet the child's needs in the days following the divorce. No less than twenty-nine witnesses appeared on that question. The chancellor, in his opinion, concluded that most of these witnesses on both sides were not particularly helpful because of their evident bias for one party or the other and because of his feeling that each of these witnesses had only limited opportunity to observe the interaction between the child and the parents that would give the witness a reasonable basis to provide helpful information to the court.
¶ 9. The chancellor, in detailed findings of fact, laid out and supported his opinion that both parents were concerned and *355 competent caregivers for the child. He concluded, based on his measure of the credibility of certain witnesses best able to objectively express an informed view on the question, that Mr. Neville was not, as he asserted before the chancellor and now urges on appeal, the primary caregiver for the child during her early years. Rather the chancellor stated that the child "was lucky enough to have both a mother and a father who more or less equally saw to her needs...." Our review of the record leaves us unconvinced that the chancellor was manifestly in error in arriving at that conclusion.
¶ 10. The chancellor, in determining that primary physical custody should be given to Dr. Neville, placed particular emphasis on his conclusion that Dr. Neville and the child would enjoy a strong extended family structure in the Long Beach area because of the presence there of Dr. Neville's mother and sister and their families, and that this would lend a measure of stability to the child's life following the trauma of her parents' divorce. We consider this a legitimate finding to give weight to the chancellor's determination of custody. The Albright decision specifically mentions "stability of home environment" as a factor to be considered. Albright, 437 So.2d at 1005. As to the other Albright factors, the chancellor found that the remaining criteria "favor[ed] neither George nor Tina," therefore compelling a finding that "it is in the best interest of [the child] that she be entrusted to the primary care and custody of [Dr. Neville]."
¶ 11. Mr. Neville attacks the chancellor's decision by pointing to specific matters in the record that were derogatory to Dr. Neville. He then urges this Court to conclude that the chancellor either ignored those factors or failed to give them their proper weight in reaching his decision on child custody. He suggests, for example, that Dr. Neville's adultery evidences a moral unfitness on her part to be the custodial parent. He attacks the chancellor's finding that the child would benefit from the ready availability of relatives in the Long Beach area by criticizing his former mother-in-law for testifying harshly against him at trial and for allegedly operating an unlicensed day care facility out of her home. He suggests the hazard of exposing the child to his former wife's lover, who "introduced [Dr. Neville] to hindu chanting [and] who believes that the traditional family relationship is an outdated concept." He disputes the chancellor's finding that Dr. Neville had purposely developed her practice to ensure flexibility to be available to personally take care of the child by pointing out that Dr. Neville, as a medical doctor, is subject to being called away at any hour of the day.
¶ 12. While this Court is satisfied that these matters may have been legitimate facts for the chancellor to consider in making a custody determination, we are not satisfied that they are of sufficient gravity to raise a legitimate concern that the chancellor abused his discretion when he failed to decide that these matters tipped the scale in Mr. Neville's favor on the custody issue. We are of the opinion that the chancellor's detailed analysis of the evidence presented to him and the weight he ascribed to various evidentiary factors in resolving the issue of custody represents a sober, reflective study of the difficult question presented to him for resolution. Having so concluded, we find that any attempt to upset the chancellor's decision would be to merely substitute the collective judgment of this Court for that of the chancellor. That is not the business of an appellate court and we decline to do so. Torrence v. Moore, 455 So.2d 778, 780 (Miss.1984).

III.

Equitable Distribution
¶ 13. Mr. Neville claims that the chancellor erred in failing to make an equitable distribution to him of some share of Dr. Neville's medical practice valued as an on-going business. The Mississippi Supreme *356 Court has never held that a professional practice is an asset subject to the equitable distribution of marital assets dictated by Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994). Certainly, evidence that Mr. Neville, by his efforts, assisted Dr. Neville during the marriage to pursue her medical degree, thereby substantially increasing her income-producing potential, entitled Mr. Neville to some special consideration when the marriage ended without fault on his part before he had the opportunity to enjoy some measure of the anticipated benefits flowing from his efforts. Monroe v. Monroe, 612 So.2d 353, 358 (Miss.1992); McNally v. McNally, 516 So.2d 499, 503 (Miss.1987). However, it appears problematical to this Court, on first blush, whether, in fashioning such relief, an evaluation of a professional practice as an on-going business indistinguishable from a hardware store would be a proper starting point to measure the other spouse's rights. We concede, nevertheless, that other jurisdictions have purported to do just this. See, e.g., O'Brien v. O'Brien, 66 N.Y.2d 576, 498 N.Y.S.2d 743, 489 N.E.2d 712 (1985). In the end, we find it unnecessary to reach the question of the propriety of attempting such a valuation in this case and leave it for another day. We do so because there are certainly ways to properly compensate a spouse in this situation besides awarding an equitable percentage of the income-producing enterprise that was made possible by the other spouse's professional degree. Such alternate means of relief could reasonably be seen to include an award of alimony made more generous than would otherwise be indicated in order to account for the spouse's past contributions. In this case, the chancellor did just that. Taking into account Dr. Neville's disproportionately large income when compared to Mr. Neville's, and further taking into account Mr. Neville's contribution to the family during seven years of Dr. Neville's educational efforts that led to her increased earning capacity, the chancellor originally awarded Mr. Neville periodic alimony in the amount of $1,400 per month. This award was to continue, as the law requires, until Mr. Neville's remarriage or until the death of either party. Alimony in this amount would appear to be well within the discretion given to the chancellor in such matters. It would appear, therefore, that it fairly addressed Mr. Neville's legitimate claim that his sacrifices to aid Dr. Neville in pursuit of her medical degree would otherwise go for naught.
¶ 14. It is at this point that the case takes an interesting turn. Mr. Neville, dissatisfied with this award because it required him to remain unmarried in order to reap some benefit from Dr. Neville's future earnings, petitioned the chancellor to reconsider the award of periodic alimony. The chancellor, finding Mr. Neville's position to have merit, modified the original award to give Mr. Neville, instead, "alimony in the nature of rehabilitative periodic alimony in the sum of $1,400 per month for a period of one hundred twenty (120) months." Assuming this award is paid out in full, therefore, Mr. Neville would be entitled to the sum of $168,000 by way of recompense for his efforts on behalf of Dr. Neville's professional training during the marriage.
¶ 15. The chancellor found as a matter of fact that Mr. Neville, even during Dr. Neville's schooling period, was not the sole source of income for the family or the sole provider of the costs of Dr. Neville's education. Dr. Neville contributed her own resources and, once she was able, worked professionally in a "moonlighting" capacity while completing some advanced training. Admittedly, much to Mr. Neville's evident irritation, Dr. Neville declined to contribute all of her "moonlighting" income to the family enterprise, but the chancellor plainly took this fact into account in his award. The chancellor calculated that Mr. Neville provided approximately sixty-two percent of the family income during the marriage. It was based on this finding and the chancellor's opinion that Mr. Neville was, under such decisions as Monroe and McNally, *357 entitled to share in some measure in Dr. Neville's future earnings, even though Mr. Neville was also a degreed professional capable of earning a substantial income in his own right. Subject to a modification of the chancellor's final award which we will discuss later in this opinion, we are of the opinion that an award of $168,000 payable over ten years was within the chancellor's range of discretion, given the facts of this case.
¶ 16. Therefore, we find that the chancellor did not err in failing to calculate the value of Dr. Neville's medical license or medical practice as a marital asset, and then using that figure in making the necessary equitable distribution of marital assets required under the Ferguson decision. By assessing the disparity in the earning capacity of the two parties and awarding Mr. Neville a substantial sum of money to equalize that disparity to some degree for a period of ten years following the dissolution of a marriage that only lasted seven years (measured to the time of separation), the chancellor addressed the unfairness of Dr. Neville being the sole future beneficiary of her enhanced income-producing capability. We do not find the award so low as to indicate an abuse of discretion, and therefore, decline to disturb this award except for the matter addressed in Section V. below.

IV.

The Division of the Personalty
¶ 17. Mr. Neville claims that the chancellor erred in giving Dr. Neville all of the Waterford crystal accumulated during the marriage. He urges that, instead, those pieces of the crystal that were wedding gifts should have been divided according to whether the source of the particular item was a family member or friend of one spouse or the other. He also argues that the chancellor erred in refusing to order Dr. Neville to return her engagement ring, which was a Neville family heirloom.
¶ 18. It is evident from the record that Dr. Neville had expressed a particular desire to be awarded all of the Waterford crystal and that the chancellor honored that request, but, in doing so, made distribution to Mr. Neville of other items of personalty to compensate for not making a physical division of the crystal. The chancellor has wide latitude in making such determinations. Turpin v. Turpin, 699 So.2d 560, 565 (Miss.1997). We find nothing so compelling in Mr. Neville's argument that we feel the necessity to interfere in the division of the personalty of the parties.
¶ 19. The chancellor properly concluded that the engagement ring was a gift from Mr. Neville to Dr. Neville. That gift necessarily predated the marriage of the parties. Thus, it was an asset brought by Dr. Neville into the marriage and was not a marital asset subject to equitable division. MacDonald v. MacDonald, 698 So.2d 1079(¶ 13) (Miss.1997). It was, therefore, beyond the chancellor's authority to order Dr. Neville to return possession of that item to Mr. Neville and his refusal to do so cannot constitute reversible error on appeal.

V.

Lump Sum Alimony versus Periodic Rehabilitative Alimony
¶ 20. It is on this issue that this Court returns its focus to the chancellor's decision, at Mr. Neville's request, to alter Mr. Neville's award from periodic alimony to what the chancellor called "periodic rehabilitative alimony."
¶ 21. It is clear from our review of the record, including the chancellor's admirable job of committing to writing his findings and conclusions, that the chancellor's original decision to grant Mr. Neville periodic alimony was not based on Mr. Neville's demonstrated need for assistance from Dr. Neville in meeting his essential living costs. Rather, it plainly appears that the chancellor intended this award *358 as a means of equitably compensating Mr. Neville for his pre-divorce sacrifices that contributed toward Dr. Neville's enhanced post-divorce earnings prospects. We further find sympathy with Mr. Neville's dissatisfaction with the award because it required him to forego the possibility of remarriage in order to reap the benefit of his efforts on behalf of his former wifea requirement that he understandably found unpalatable.
¶ 22. The chancellor, upon reconsideration, felt likewise and found Mr. Neville's position to have merit. It was specifically to remedy this concern that the chancellor amended his earlier award of periodic alimony, terminable at the instant of Mr. Neville's remarriage, to award him, instead, $1,400 per month for a fixed term of ten years. It is, however, at this point, that we conclude that error crept into the chancellor's order.
¶ 23. We are satisfied beyond dispute that the chancellor intended to award Mr. Neville the fixed sum of $168,000, payable in installments, as equitable compensation for the loss of his reasonably anticipated opportunity to share in Dr. Neville's future earnings. Inherent in that finding is the conclusion that the chancellor specifically intended that amount to be received by him without consideration of whether Mr. Neville remarried. That being the case, we conclude that the chancellor manifestly erred when he termed Mr. Neville's alternate relief as "periodic rehabilitative alimony" since such an award, as in the case of the more traditional periodic alimony, remains subject to further modification by the court and is subject to termination automatically upon remarriage by the recipient. Hubbard v. Hubbard, 656 So.2d 124, 130 (Miss.1995).
¶ 24. Nevertheless, the Mississippi Supreme Court has made it abundantly clear that, in determining the true nature of a financial award in a divorce proceeding, this Court must look to the nature of the award itself and not to the particular label that the chancellor affixes to the award. Bowe v. Bowe, 557 So.2d 793, 795 (Miss. 1990).
¶ 25. Therefore, in view of this Court's finding that the chancellor did not intend for the award to terminate in the event Mr. Neville should remarry during the ten-year life of these payments, we hold the award to be lump sum alimonyan award not subject to subsequent modification by the chancellor and one that will continue despite the remarriage of the recipient. Maxcy v. Estate of Maxcy, 485 So.2d 1077, 1078 (Miss.1986).

VI.

Attorney's Fees
¶ 26. Mr. Neville raises a claim that the chancellor abused his discretion in denying him reasonable attorney's fees for prosecuting this divorce action. He argues that proof that his monthly living expenses exceeded his existing income demonstrated with the necessary certainty his inability to pay his attorney's fees. This fact, coupled with the wide disparity in income between himself and his former wife, demonstrates the inequity of denying him a reasonable attorney's fee, according to his argument.
¶ 27. The award of attorney's fees in a divorce action is a matter vested in the sound discretion of the trial court. Brooks v. Brooks, 652 So.2d 1113, 1120 (Miss.1995). We are satisfied that, based on proof that Mr. Neville was earning in excess of $50,000 per year at the time of trial, the chancellor's conclusion that Mr. Neville was able to defray the cost of his representation was not so manifestly in error as to require this Court to intervene.

VII.

Other Issues
¶ 28. Mr. Neville urges this Court to reverse the judgment because of the chancellor's evidentiary ruling denying the admissibility of a purported conversation between Dr. Neville and her aunts that *359 Mr. Neville's counsel attempted to elicit in cross-examining Dr. Neville. We conclude that, contrary to Mr. Neville's assertion, the clear intention in offering evidence of this conversation was to admit the statements of the aunts, and not those of Dr. Neville, into evidence. The chancellor was entirely correct in excluding the evidence on a timely hearsay objection. Fleming v. Fleming, 213 Miss. 74, 85, 56 So.2d 35, 39 (1952); M.R.E. 802.
¶ 29. Mr. Neville also complains that the chancellor permitted several witnesses to testify for Dr. Neville who were not disclosed in discovery or in the pretrial order. He does not suggest what prejudice arose by virtue of the untimely disclosure of these witnesses. Only two of the witnesses appeared to have had any influence on the outcome of the case. Both of these testified on the matter of child custody. Mr. Neville demonstrated nothing at trial nor before this Court to indicate that he was unfairly ambushed by the testimony of these witnesses or that, had he been given the opportunity, he could have gathered evidence to impeach these witnesses or rebut their evidence. Especially in the matter of child custody, the chancellor should be armed with as much probative evidence as possible in order to make an informed decision. Absent some clearer demonstration of actual prejudice to Mr. Neville, we decline to reverse this case solely because of possible untimeliness in producing the names of witnesses.

VIII.

Dr. Neville's Cross-Appeal
¶ 30. Dr. Neville raises two issues on cross appeal. First, she suggests that the chancellor's award of $168,000 to Mr. Neville was an abuse of discretion since he was fully capable of being self-supporting. For the reasons we have discussed at some length already, we find that this award was an equitable resolution of the uncontroverted fact that Mr. Neville contributed substantially, in a number of ways, to Dr. Neville's enhanced earning abilitythe enjoyment of which he was entitled to contemplate by virtue of their marriage, but which opportunity he lost because of Dr. Neville's adulterous activities. We find this issue to be without merit.
¶ 31. Secondly, she argues that child support should be increased to include the statutory percentage of the monthly $1,400 payments she was ordered to pay. Because we have determined this award to be lump sum alimony payable in installments rather than periodic alimony, we do not find it to be "alimony" necessarily includable in Mr. Neville's adjusted gross income as that figure is defined in section 43-19-101(3)(a) of the Mississippi Code. Miss.Code Ann. § 43-19-101(3)(a) (Supp.1998).
¶ 32. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS AFFIRMED ON DIRECT APPEAL AND CROSS-APPEAL. COSTS OF THIS APPEAL ARE TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.
BRIDGES, C.J., THOMAS, P.J., IRVING, KING, LEE, PAYNE, AND SOUTHWICK, JJ., CONCUR.
COLEMAN AND DIAZ, JJ., NOT PARTICIPATING.