989 So.2d 444 (2008)
Candace D. PRICE, Appellant
v.
Jason Lagarret McBEATH, Jr., Appellee.
No. 2007-CA-00880-COA.
Court of Appeals of Mississippi.
August 19, 2008.
*447 Darnell L. Nicovich, attorney for appellant.
Lowe Arthur Hewitt, attorney for appellee.
Before LEE, P.J., IRVING and ROBERTS, JJ.
ROBERTS, J., for the Court.
¶ 1. Jason Lagarret McBeath, Jr., and Candace D. Price had a child, Jason Latrell McBeath (Jay). Candace enlisted in the United States Army, and while she was in basic training, Jason petitioned for custody of Jay. The Harrison County Chancery Court conducted a hearing on Jason's petition, but Candace did not appear at the hearing. Ultimately, the chancellor awarded Jason custody of Jay.
¶ 2. Subsequently, Candace filed a motion to reconsider or, alternatively, a motion to set aside the judgment in which she claimed Jason did not properly serve her with process. Candace also requested that the chancellor sanction Jason. The chancellor entered a temporary order, returned Jay to Candace's custody, and reserved ruling on all other matters.
¶ 3. Nearly two years later, the chancellor finally conducted a hearing. The record contains no notice regarding the subject of that hearing. In any event, that hearing turned out to be on the subject of custody. Candace represented herself. She cross-examined witnesses, presented evidence, and called one witness to testify during her case-in-chief.
¶ 4. The chancellor later entered a final judgment, awarding Jason custody of Jay. Candace appeals and claims that the chancery court lacked personal jurisdiction over her, because Jason never completed personal service of process. Candace also claims she had improper notice of the initial custody hearing. Finally, Candace asserts that the chancellor erred when she awarded Jason custody of Jay. Finding no error, we affirm the chancellor's judgment.

*448 FACTS AND PROCEDURAL HISTORY
¶ 5. Jason was adjudicated to be Jay's father incident to a paternity action initiated by the Mississippi Department of Human Services. The chancellor ordered Jason to pay Candace child support. Candace later enlisted in the United States Army and named her mother, Tonya Price, as Jay's temporary guardian. While Candace was in basic training, Jason filed a petition for custody of Jay. By way of his petition, Jason contended that Candace would be temporarily returning to Mississippi, where she could be served with personal service of process at her home in Biloxi.
¶ 6. On December 28, 2004, the chancery clerk issued summonses pursuant to Mississippi Rules of Civil Procedure 4 and 81. The Rule 81 summons directed Candace to appear to defend the petition on January 20, 2005. The record contains a copy of a notarized return in which process server Marie Singleton indicated that she personally served Candace with the Rule 4 and Rule 81 summonses on December 28, 2004.
¶ 7. On January 20, 2005, Jason appeared at the hearing. Candace did not appear. There is no transcript of that hearing. The chancellor later entered a judgment and awarded Jason custody of Jay. The chancellor did not order Candace to pay child support at that time. Instead, the chancellor reserved the issue of child support for a determination of Candace's income. Additionally, the chancellor reserved the issue of Candace's visitation rights.
¶ 8. Approximately one month after the hearing, Candace filed a motion to reconsider or, alternatively, to set aside the chancellor's judgment pursuant to Mississippi Rule of Civil Procedure 60(b). Candace also requested sanctions pursuant to Mississippi Rule of Civil Procedure 11. Candace asserted that she had not been personally served with process. According to Candace, the summonses had been left with her sister, and the summonses were not left at her home.
¶ 9. Jason responded by filing a petition for citation of contempt. Jason claimed Candace was in contempt of the chancellor's judgment because Candace refused to turn over Jay to his custody. Jason requested that Candace be incarcerated and that the chancellor enter another order granting him custody of Jay. Based on the record currently before us, the chancellor never resolved Jason's petition for contempt.
¶ 10. On May 31, 2005, the chancellor entered a temporary judgment on Candace's motions. The chancellor reserved the decision regarding whether to set aside her previous judgment. However, the chancellor later temporarily returned Jay to Candace's custody, ordered Jason to pay Candace child support, and awarded Jason visitation with Jay. The chancellor also ordered Jason and Candace to file affidavits that conformed to the Uniform Child Custody Jurisdictional Act (UCCJA). The chancellor further ordered "that a final hearing [would] be held in this matter on August 10, 2005."
¶ 11. The hearing did not take place on that date, and the record does not indicate why the hearing did not occur.[1] However, Jason and Candace filed their UCCJA affidavits on that date. The chancery court administrator reset the hearing for September 9, 2005. For whatever reason, the hearing did not take place on that date *449 either. A copy of the chancery clerk's docket is included with Candace's record excerpts. The docket shows multiple notices of trial, but there is absolutely no explanation as to why they did not occur.
¶ 12. The matter was eventually noticed for hearing on March 26, 2007. Because the record does not contain the corresponding notice of hearing, the intended subject of that hearing is entirely unclear. At that time, five distinctly separate matters were before the chancellor: (1) Candace's motion for reconsideration, (2) Candace's alternative motion to set aside the judgment granting Jason custody of Jay, (3) Candace's motion for sanctions, (4) Jason's petition for contempt, and (5) Jason's second request of custody. Additionally, Jason had tendered discovery to Candace. Candace did not answer Jason's requests for admission, so Jason requested that the chancellor find that Candace was deemed to have admitted his requests for admission. Based on the current state of the record, we have no way of knowing what the hearing intended to resolve.
¶ 13. Regardless, one week before the scheduled hearing, Candace's attorney, LaQuetta Golden, filed a motion to withdraw. The chancellor entered an order on March 21, 2007, and allowed Golden to withdraw. The March 21st order allowed Candace an unspecified amount of time to secure new counsel.
¶ 14. On Monday, March 26, 2007, the hearing finally took place as scheduled. At the beginning of the hearing, attorney Fred Lusk addressed the chancellor and stated that Candace contacted him the previous Friday and requested that he represent her at the hearing. Lusk related to the chancellor that he told Candace he could not be prepared for a hearing on Monday, because he was not familiar with the issues and did not have Candace's file. The chancellor mentioned that Golden said Candace had not stayed in contact with her. Candace disputed that. According to Candace, she asked Golden to withdraw because Golden was not prepared to represent her. Candace claimed she contacted Golden "plenty of times," that she left messages with Golden, and that no one returned her calls. Tameka Brown-Morris, apparently with Golden's office, presented the chancellor with an order nearly identical to the March 21st order. However, in the order Brown-Morris presented to the chancellor, the provision allowing Candace time to secure new counsel was struck through. Brown-Morris then left the courtroom.
¶ 15. At that point, Lusk again told the chancellor that he was not prepared to represent Candace that day, because he was not familiar with the issues and did not have Candace's file. According to Lusk, Candace tried to retrieve her file from Golden, but Golden told Candace that her file "had been lost in the hurricane." The chancellor then stated, "[j]ust have a seat, Mr. Lusk, and let me go over where we are with this to see what we are going to do." The chancellor was not apprised of the purpose of the hearing, so she asked Jason's attorney, "[w]hat are the pleadings that are before the court today?" Jason's attorney, Jay Foster, stated that the hearing was on Jason's petition for custody of Jay.
¶ 16. Foster told the chancellor about her June 2, 2005, temporary order in which the chancellor returned custody of Jay to Candace. After some discussion in which all parties agreed that they could not remember why the hearing did not take place on August 10, 2005, the chancellor said, "I'm going to take a brief recess and talk to Mr. Lusk and Mr. Foster. I will be out in about 10 minutes."
¶ 17. The record is silent as to what transpired during that recess. However, *450 it must have been of some significance because the next notation in the transcript is the statement "Mr. Lusk did not return." In any event, the chancellor next stated to Candace, "It's my understanding that Mr. Lusk talked to you  we are on the record, Ms. Price  and that you desire to go forward without representation; is that correct?" Candace answered, "Yes, Your Honor."[2]
¶ 18. The chancellor then conducted a hearing on Jason's original petition for custody of Jay. The chancellor did not first resolve whether the chancery court had jurisdiction over Candace, presumably because Candace did not request such a resolution, and because Candace answered that she was ready to proceed. Jason called Sylvia Thigpen, who testified, in large part, regarding a confrontation between Jason and Candace that occurred outside Thigpen's daycare. Jason also called his mother, Connie McBeath. After Jason testified, he called Candace as an adverse witness. Candace personally cross-examined Jason's witnesses. After Jason rested, Candace called her mother, Tonya Price, to testify on her behalf. After Tonya testified, Candace took the stand.
¶ 19. On April 18, 2007, the chancellor entered her final judgment. The chancellor awarded Jason custody of Jay. Additionally, the chancellor found that Candace had abandoned her jurisdictional challenge regarding improper service of process. Candace appeals.

ANALYSIS

I. WHETHER CANDACE WAS PROPERLY SERVED WITH PROCESS.
¶ 20. Candace claims the chancery court did not have jurisdiction to award Jason custody of Jay. Whether a trial court had jurisdiction is a question of law. Trustmark Nat'l Bank v. Johnson, 865 So.2d 1148, 1150(¶ 8) (Miss.2004) (citations omitted). We conduct a de novo review of jurisdictional questions on appeal. Id.
¶ 21. "The existence of personal jurisdiction depends upon reasonable notice to the defendant." Mansour v. Charmax Indus., 680 So.2d 852, 854 (Miss.1996) (citing Noble v. Noble, 502 So.2d 317, 320 (Miss.1987)). "A trial court can acquire jurisdiction over an individual through service of process." Id. (citing Aldridge v. First Nat'l Bank, 165 Miss. 1, 14, 144 So. 469, 470 (1932)). In Mississippi, one way to accomplish service of process upon a resident individual "other than an unmarried infant or a mentally incompetent person" is by personally delivering a copy of the summons and complaint to the person. M.R.C.P. 4(d)(1)(A).
¶ 22. Candace has consistently maintained that she was never personally served with process. Jason filed his petition for custody on October 26, 2004. Summonses pursuant to Mississippi Rules of Civil Procedure 4 and 81 were issued on December 28, 2004. The same day, professional process server Singleton personally served someone at the address listed on the summons, 330 Benachi Avenue, Apartment 118, Biloxi, Mississippi. Singleton filed the returns the next day. On one line, Singleton indicated that she personally served "Candace D. Price." On a separate line, Singleton indicated that she personally served "Candace Donella Price."
¶ 23. Candace claims Singleton did not serve her, and this is not a mere case of a litigant maintaining that she was not served. There are three reasons to suspect *451 whether Singleton actually served Candace. First, Candace claims she was scheduled to return to her military post prior to December 28, 2004. The record contains a letter from Candace's mother, Tonya, dated January 7, 2004.[3] That letter was filed on January 10, 2005. According to Tonya's letter, Singleton left the summonses with her other daughter, Donella Price, and Singleton could not have left the summonses with Candace, because Candace, who was on leave from the Army, returned to her post prior to December 28, 2004.[4]
¶ 24. Second, on one blank line in the return, Singleton listed the name of the person she served as "Candace Donella Price." Candace's middle initial is "D," but her middle name is not Donella. Candace's middle name is Deon. However, Candace's sister's name is Donella.
¶ 25. Finally, in Jason's petition for custody of Jay, Jason listed Candace's street address as Bayview Avenue. Singleton claimed she served Candace at Benachi Avenue. Candace did not live at Benachi Avenue, but her sister, Donella, did.
¶ 26. In any event, on January 19, 2005, Singleton executed an affidavit and swore that she personally served "Candace D. Price" and that the person who answered the door at Apartment 118 at 330 Benachi Avenue identified herself as "Candace D. Price" before she served her. Obviously, there was a factual dispute whether Singleton successfully served Candace. It would not be unreasonable to conclude that Singleton mistakenly served Candace's sister, Donella. However, whether Singleton actually served Candace is not the outcome determinative question that resolves this issue.
¶ 27. Proper service of process is not the only means by which a trial court may acquire jurisdiction over a person. "[A] trial court can acquire jurisdiction over the person through his appearance." Mansour, 680 So.2d at 854 (citing State ex rel. Moak v. Moore, 373 So.2d 1011, 1012 (Miss.1979)). "[W]hether a person may attack jurisdiction on appeal depends entirely upon when the objection is raised." Mitchell v. Mitchell, 767 So.2d 1078, 1085(¶ 24) (Miss.Ct.App.2000). "If it was raised before or simultaneously with an answer or other responsive pleading, the objection is not waived by filing other pleadings, or even by participating in a trial on the merits." Id. "If, however, the objection is not raised until after an answer or other pleadings are filed (other than motions for continuance not considered to be a general appearance), the objection is waived per Rule 12(h)." Id.
¶ 28. Candace, who was represented by counsel at the time, did not file a motion to dismiss pursuant to Rule 12. Candace filed a motion to reconsider. Motions to reconsider are governed by Mississippi Rule of Civil Procedure 59(e). See Brame v. Brame, 796 So.2d 970, 972 n. 1 (Miss.2001). Candace also filed a motion to set aside the chancellor's judgment. A motion to set aside a judgment falls under the provisions of Mississippi Rule of Civil Procedure 60. Pursuant to Rule 60(b)(4), a motion to set aside a judgment may be made on the basis that a judgment is void. Arguably, it could be said that Candace *452 preserved the jurisdictional question through her motion to set aside the judgment. However, Candace also requested sanctions. It is inconsistent to argue that a court lacks jurisdiction to award custody yet simultaneously submit that a court has sufficient jurisdiction to award sanctions. Inconsistent argument notwithstanding, precedent dictates that a party may raise a jurisdictional question simultaneously with other pleadings.
¶ 29. For discussion's sake alone, as we do not expressly find or decline to find that Candace properly preserved the jurisdictional issue when she filed her motion to reconsider or to set aside the judgment and for sanctions, we must find that Candace waived this issue for two reasons. First, Candace did not advance the issue or timely seek resolution of it. This Court considered a similar issue in Schustz v. Buccaneer, Inc., 850 So.2d 209 (Miss.Ct. App.2003). In Schustz, this Court found that a "delay in contesting the court's in personam jurisdiction over it for a period in excess of twelve months after having appeared in the action through counsel was untimely." Id. at 214(¶ 20). Schustz went on to find that "the appearance and lengthy ensuing period of inactivity, acting in conjunction, constituted a waiver of any defects in the form or manner of service." Id. at 214-15(¶ 20).
¶ 30. Candace filed her motions to reconsider, set aside, and for sanctions on February 23, 2005. Candace did not request a ruling on her motions during the two years that preceded the March 26, 2007, hearing. If a delay of twelve months was untimely in Schustz, then a delay of twenty-five months is likewise untimely here.
¶ 31. Second, Candace did not seek a ruling on the jurisdictional question at the hearing. She then proceeded to represent herself. Where one participates in a matter, presents evidence, calls witnesses, and cross-examines witnesses, she subjects herself to the court's jurisdiction and waives all objections based on improper or insufficient service of process. Isom v. Jernigan, 840 So.2d 104, 107(¶ 9) (Miss. 2003). Candace is not entitled to leniency simply because she proceeded pro se. See Chasez v. Chasez, 935 So.2d 1058, 1062(¶ 3) (Miss.2005). Accordingly, we must find that Candace waived the jurisdictional issue: (a) when she failed to timely seek resolution of the issue and (b) when she participated in the hearing without first seeking an adjudication of the jurisdictional issue. This issue is without merit.

II. WHETHER CANDACE WAS PROPERLY SERVED WITH A SUMMONS PURSUANT TO RULE 81 OF THE MISSISSIPPI RULES OF CIVIL PROCEDURE.
¶ 32. Candace's second issue is somewhat similar to her first. Candace argues that the chancery court had no jurisdiction over her on March 26, 2007. Candace's position on this issue tracks back to what she finds to be procedural defects that were initiated when Singleton purportedly served her in late 2004. On December 28, 2004, Singleton purportedly served Candace with a summons pursuant to Mississippi Rule of Civil Procedure 81. That summons instructed Candace to appear at a hearing on Jason's petition for custody on January 20, 2005.
¶ 33. Candace notes that pursuant to Mississippi Rule of Civil Procedure 81(d)(2), Jason should have provided her with thirty days notice in advance of the hearing. Notwithstanding Candace's claim that she never received service of process, Candace submits that the notice in the summons violated her right to due process. Any defect regarding notice of *453 the March 26, 2007, hearing was waived when Candace failed to raise it before the chancellor. Isom, 840 So.2d at 107(¶ 9). Accordingly, we find no merit to this issue.

III. WHETHER THE CHANCELLOR ERRED WHEN SHE AWARDED JASON PRIMARY PHYSICAL CUSTODY OF JAY.
¶ 34. In her final judgment, the chancellor addressed the familiar factors detailed in Albright v. Albright, 437 So.2d 1003, 1004 (Miss.1983). The chancellor found that four factors did not particularly favor either Jason or Candace. Those factors were: (1) the employment of each parent; (2) the physical and mental health of each parent; (3) emotional ties between each parent and the child; and (4) the catch-all factor titled, "any other relevant factors." Additionally, the chancellor found that one factor, the child's preference, was irrelevant, as Jay was not old enough to state a preference. The chancellor found that only one factor, continuity of care, slightly favored placing Jay in Candace's custody.
¶ 35. However, the chancellor found that four factors slightly favored placing Jay in Jason's custody: (1) age, health, and sex of the child; (2) moral fitness of each parent; (3) home, school, and community record of the child; and (4) stability of the home and employment of each parent. The chancellor also found that one factor, parenting skills and willingness and capacity to provide primary care, heavily favored placing custody of Jay with Jason. The chancellor ultimately concluded that it was in Jay's best interests that Jason should have custody.
¶ 36. On appeal, Candace claims the chancellor erred when she awarded Jason custody of Jay. "[A]bsent an abuse of discretion, we will uphold the decision of the chancellor." Hollon v. Hollon, 784 So.2d 943, 946(¶ 11) (Miss.2001) (citation omitted). To disturb the factual findings of the chancellor, this Court must determine that the factual findings are manifestly wrong, clearly erroneous, or the chancellor abused his discretion. Id. However, where the chancellor improperly considers and applies the Albright factors, an appellate court is obliged to find the chancellor in error. Id. (citations omitted).
¶ 37. Candace concedes that the chancellor properly found that the physical and mental health and age of the parents factor was equally weighted between her and Jason. Candace also concedes that Jay is too young to state a custody preference. However, Candace argues that the chancellor erred when she reviewed the following factors: (1) age, health, and sex of the child; (2) continuity of care; (3) parenting skills and willingness and capacity to provide primary child care; (4) emotional ties of the parent and the child; (5) moral fitness of the parents; (6) the home, school, and community record of the child; (7) stability of home and employment of each parent; and (8) "any other relevant factors." We will review each of the factors that Candace addresses on appeal. However, we are mindful that "the polestar consideration in child custody cases is the best interest and welfare of the child." Albright, 437 So.2d at 1005.

1. Age, Health, and Sex of the Child
¶ 38. Candace argues that the chancellor erred when she found that the first factor  age, health, and sex of the child  favored Jason. According to Candace, the chancellor should have found that this factor favored her. Candace relies on the proposition that she has access to medical care because she is in the Army. Candace also submits that the presumption commonly known as the tender years doctrine favors placing Jay in her custody.
*454 ¶ 39. The tender years doctrine has been weakened in recent years, but there is still a presumption that a mother is generally better suited to raise a young child. Hollon, 784 So.2d at 947(¶ 14). In Hollon, the Mississippi Supreme Court found that because the child was barely three years old at the time the trial ended, this factor favored the mother, despite the weakened legal presumption. Id. However, children who are at least four years old may not be subject to the tender years doctrine. Lee v. Lee, 798 So.2d 1284, 1289(¶ 18) (Miss.2001). Jay was five at the time of the hearing. We cannot conclude that the chancellor's findings as related to this issue are clearly erroneous or manifestly wrong.

2. Continuity of Care
¶ 40. Next, Candace claims the chancellor erred when she found that continuity of care was slightly in Candace's favor. Candace argues that the chancellor should have found that factor heavily favored her because she provided the majority of care prior to the March 26, 2007, hearing. Jason and his mother had some visitation with Jay. When Candace went to boot camp, she appointed her mother as Jay's guardian. Jay stayed with Jason for a couple of weeks, after the subsequently revoked final judgment. Jason also had make-up visitation with Jay between March 27, 2007, and April 18, 2007. After that time, he received primary physical custody of Jay. We certainly agree with the chancellor's conclusion that this factor favors placing Jay in Candace's custody, but we cannot conclude that the chancellor was manifestly wrong or clearly in error when she found this factor slightly favored Candace rather than heavily favored Candace.

3. Parenting Skills and Willingness and Capacity to Provide Primary Care
¶ 41. Candace claims this factor heavily favors placing Jay in her custody. Candace notes that she and her husband have a daughter and that her daughter lives with her all the time. Candace further notes that she provides primary care of her daughter. Candace points out that Jason has a child from another relationship; he does not have a relationship with that child, and he has no plans to seek a relationship with that child other than paying court-ordered child support.[5] According to Candace, before Jason filed his initial complaint for custody of Jay, he did not participate in Jay's life. Candace's arguments thus far are relevant to whether Jason is willing to provide primary care. However, by asserting that he is the proper parent to have custody of Jay, Jason has clearly indicated that he is willing to provide primary care. If Candace's allegations are true, it is disheartening that Jason does not intend to have a relationship with his other child, as that child needs a father as much as any other child, but it is not demonstrative that Jason is unwilling to provide primary care of Jay other than by way of conjecture.
¶ 42. Candace's arguments and points thus far may also be relevant toward capacity to provide primary care. That is, *455 by providing primary care of her daughter, Candace may be a more suitable person to have custody of Jay as opposed to Jason, who had comparatively little experience providing primary care of a child. However, that is not the sole consideration under this factor.
¶ 43. The chancellor's findings in regard to this factor contained some discussion of Jay's medical history. The chancellor noted that Candace failed to seek medical attention for Jay on more than one occasion. One time when Jay was in Jason's custody, Jason had to seek medical care for a second degree burn on Jay's foot. Jay sustained that injury while he was in Candace's custody. A similar situation arose when Jason had to seek treatment for Jay when Jay acquired athlete's foot while in Candace's custody. Additionally, there was testimony that Jason discovered that Jay had severe ringworms and had sustained black eyes while in Candace's custody. Considering those events, the chancellor could have reasonably concluded that Jason possessed better parenting skills than Candace  not in that those medical events transpired when Jay was in Candace's custody, but that Jason, rather than Candace, sought medical attention for Jay.
¶ 44. An additional matter under this heading bears discussion. One of the chancellor's considerations under this factor was the fact that Candace refused to allow Jason to have any visitation with Jay for approximately eighteen months at the time of the March 26, 2007, hearing. On appeal, Candace claims she allowed Jason to have liberal visitation with Jay, but Jason was not available to spend time with Jay, so Jason's mother spent that time with Jay. Candace also claims that Jason has not provided support other than a car seat and a stroller. Candace disputes Jason's assertion that he paid child support via a withholding order. Candace notes that Jason never presented any proof of such a withholding order. Be that as it may, the chancellor was concerned that if Candace received custody of Jay, Candace might impede Jason's relationship with Jay. The chancellor could have reasonably concluded that a parent who would impede the child's relationship with the other parent had poor parenting skills as opposed to a parent who fostered a child's relationship with the other parent. Accordingly, we cannot find that the chancellor was manifestly wrong or clearly erroneous when she concluded that this factor favored placing Jay in Jason's custody.

4. The Employment of the Parent and Responsibilities of That Employment
¶ 45. At the time of the hearing, Candace was on active duty in the United States Army. Her obligation to the Army extends until 2011. Jason was a firefighter. The chancellor found that this factor favors neither party. Candace argues that this factor favors placing Jay in her custody, because her employment provides stability and benefits that are not available to Jason. Candace further argues that this factor favors her because her working hours are more regular and better suited to providing care than Jason's employment, which requires that he be away from home for long periods during his shifts.
¶ 46. Both parents are commendably employed. It is very likely that Jay will one day be inspired by both of his parents' service to their country and their community. Candace's argument regarding benefits has some merit, but it is lessened in that the benefits, assuming that those benefits are insurance and medical care, are available to Jay regardless of whether Jason is in Candace's custody. Candace does not specify exactly what *456 benefits she references. Additionally, though Jason may have occasional irregular hours in his capacity as a firefighter, his family is available to help provide child care. Jason is married. His extended family is nearby. Further, there was no evidence that in the event that Jason should have irregular hours one shift, he would not, in turn, offset that time so that he would have more time to spend with Jay. That is, there was no evidence that Jason worked significantly more hours than any other employed person. Accordingly, we cannot find that the chancellor was manifestly wrong or clearly erroneous when she found that this factor did not favor either party.

5. Emotional Ties of the Parent and the Child
¶ 47. The chancellor found that this factor did not favor either party. Under this heading, Candace's brief contains the following statement, "[b]oth Candace and Jason claim to be closely bonded to the child." The chancellor's findings include a similarly brief statement. Though Candace may dispute the chancellor's conclusion, she does not expressly do so in her brief.
¶ 48. Candace could have argued that based on Jay's relative lack of familiarity with Jason, she was more closely bonded to Jay. However, such an argument could be refuted by the fact that Candace arguably prevented Jason from having a significant relationship with Jay during the earliest part of Jay's life. It is clear from the other arguments that Candace makes that she would dispute such a conclusion. In an earlier argument, Candace claims that she offered Jason liberal visitation with Jay, and Jason did not take advantage of that time. However, resolution of that factual dispute is beyond our mandate as a reviewing court. The preceding discussion is for illustrative purposes only and is relevant merely to point out that had the chancellor considered these matters, she would not be manifestly wrong or clearly erroneous in finding that this factor favored neither party.

6. Moral Fitness of the Parents
¶ 49. The chancellor concluded that this factor slightly favored placing Jay in Jason's custody. The principal consideration that led the chancellor to her conclusion involved an altercation at Jay's daycare during October 2004. Candace wanted to take Jay with her, but Jason refused. Jason claimed he refused because he smelled marijuana in Candace's car. Law enforcement responded and concurred with Jason that Candace's car smelled like marijuana. No one was arrested as a result of that altercation  for marijuana possession or otherwise. It bears emphasizing that as far as the record indicates, Candace has never been accused of or found guilty of involvement with any illegal substances.
¶ 50. Candace claims that she is more morally suited to have custody of Jay because Jason fathered another child out of wedlock approximately the same time he fathered Jay out of wedlock, and he has not sought a relationship with that child. As stated above, if Jason is the father of the other child, it is unfortunate for the child that Jason has not sought a relationship with his child. One could logically conclude that a father who refused to participate in a child's life is less morally suited to have custody of a child as opposed to a father who participated in his child's life. However, one could also logically conclude that based on all relevant consideration, the fact that Jason has neglected to participate in his alleged child's life, in and of itself, is not sufficient to find Jason morally unfit to have custody of Jay. *457 The chancellor could have found that even though Candace herself has not been found to have used illegal substances, at worst, she condoned marijuana use or transportation in her car at approximately the same time she intended to take custody of Jay. The chancellor could have reasonably concluded that someone who would expose their child to illegal substances was less morally suited to have custody of a child as opposed to someone who did not have a relationship with another one of his children. Though we might not reach the same result, based on the foregoing discussion, we cannot find that the chancellor was manifestly wrong when she reached that conclusion.

7. The Home, School, and Community Record of the Child
¶ 51. The chancellor found that this factor slightly favored placing Jay in Jason's custody. The chancellor reached her decision, in large part, after discussing the fact that while in Jason's custody, Jay would have access to Jason's extended family. Candace claims the chancellor erred in her findings. According to Candace, this factor favors placing Jay in her custody. Candace bases her position on the fact that Jay attended Head Start near her home in South Carolina.
¶ 52. The chancellor could have considered the presence of Jason's extended family under the "stability of home and employment of each parent" heading, but it is not unprecedented to consider the presence of extended family under this factor. E.g., Mixon v. Sharp, 853 So.2d 834, 840(¶ 28) (Miss.Ct.App.2003). In any event, Jay was five years old at the time of the hearing, so he had a limited school and community record. A reasonable fact-finder could have concluded that this factor favored Candace because Jay attended Head Start when he was in her custody. At the same time, a reasonable fact-finder could have concluded that Jay's attendance of Head Start was not outcome determinative because, at five years old, Jay would have stopped attending Head Start in May 2007, slightly less than two months from the time of the March 26, 2007, hearing. Consequently, we cannot find that the chancellor abused her discretion when she found that this factor favored placing Jay in Jason's custody.

8. Stability of Home and Employment of Each Parent
¶ 53. The chancellor found that this factor slightly favored placing Jay in Jason's custody. Candace claims the chancellor erred. According to Candace, the chancellor should have weighed this factor in her favor.
¶ 54. The chancellor mentioned many facts related to this factor, but the chancellor did not exactly state why she found that this factor slightly favored placing Jay in Jason's custody. In any event, the chancellor mentioned: (1) both parties live in homes suitable for raising children; (2) many of Jason's relatives, including his mother, live near Jason; (3) Jason's mother is willing to help care for Jay; (4) Jason's wife is an X-ray technician; (5) Candace's husband is a sous-chef and was taking online courses in real estate and business; (6) Jason was raising his wife's son as his own, because his stepson had no relationship with his biological father; (7) Candace's husband had a suspended driver's license for reasons not identified in the record; (8) Candace's husband treated Jay as though Jay was his own child; and (9) Jason had been employed as a firefighter since June 2006, but he was considering a career in education once he completes his bachelor's degree.
¶ 55. Candace takes issue with that part of the chancellor's reasoning which *458 involved Jason's proximity to his mother and other extended family members. According to Candace, "[w]hile having an extended family in close proximity is favorable, and arguably beneficial for a child, [she] does not feel that it should be a major determinative factor in custody matters." Candace submits that she was penalized for her ability to live independently and to take care of Jay without the assistance of other family members. Candace argues "that her ability to raise Jay and provide a stable home for him while stationed away from her extended family should have been weighted positively in her favor, rather than negatively."
¶ 56. The chancellor did not expressly state why Candace's home or her employment was inferior as it pertains to custody of Jay as compared to Jason's home or employment. The chancellor mentioned that Jason's extended family lived near him. Presence of extended family is certainly a reasonable consideration under this factor. Neville v. Neville, 734 So.2d 352, 355(¶ 10) (Miss.Ct.App. 1999). We can find no indication that the chancellor found that Candace's military career rendered her less-suited to have custody of Jay.
¶ 57. Reasonable minds could differ regarding the effect military service has on the stability of a home. Those who serve in the military are very often subject to being transferred. Candace notes that though she is subject to being transferred, even in the event she is transferred, she would have the benefit of military base housing, security, and organized children's activities for Jay. A reasonable fact-finder could conclude that while the location of a soldier or sailor's home might change, the potential of a military transfer does not render a soldier or sailor's home any less stable than a civilian's. Alternatively, a reasonable fact-finder could conclude that frequent moves, school changes, and displacement from friends and familiar places are not in a child's best interest. From another perspective, some could conclude that the children of soldiers and sailors benefit when their parents are transferred in that the children are exposed to places, cultures, and opportunities that are not available to others.
¶ 58. Because there are so many variables regarding military service, its effect on the home and the interplay among the many other considerations under Albright, it is impossible to reach a bright-line rule regarding a parent's military service. Accordingly, such a determination, properly supported by substantial evidence, must be left to chancellors due to their proximity to the parties, as opposed to the relatively cold record we have on appeal. That is precisely why our review is limited to the familiar abuse of discretion standard. However, we can say in all confidence that military service, in and of itself, should not weigh negatively against the stability of a parent's home or employment.
¶ 59. In the present matter, a reasonable fact-finder could have found that the possibility of transfer does not weigh against Candace. A fact-finder could have concluded that because there was no testimony regarding the likelihood of Candace being transferred and no testimony regarding where Candace could be transferred other than her statement that she would like to be transferred to Florida, Candace's home was just as stable as Jason's. Still, that would only place Candace on equal footing with Jason, and the chancellor was not unreasonable in finding that the presence of extended family made Jason more suitable to have custody of Jay. Accordingly, we cannot find that the chancellor abused her discretion.

*459 9. Other Factors
¶ 60. The chancellor found that no other factors would weigh in either Jason or Candace's favor. However, the chancellor mentioned other matters that she considered. The chancellor noted "the possibility that [Jason] has fathered another child and is not seeking a relationship with that child." The chancellor mentioned that there had yet to be an adjudication whether Jason fathered another child. Again, we note that Candace presented a document from Reliagene in which it was found that Jason was not excluded as the father of the child. The chancellor also noted that Jason was, at that time, paying child support to the mother of that child. At that point, the chancellor found that the catch-all factor did not favor either parent.
¶ 61. Candace claims the chancellor erred. According to Candace, the chancellor should have weighed this factor in her favor. Candace submits that the chancellor should have considered that Jay had a relationship with her daughter-Jay's half-sister. Chancellors certainly have factored in any potential negative effects of splitting up siblings, including half-siblings, when determining custody. McWhirter v. McWhirter, 811 So.2d 397, 399(¶ 7) (Miss.Ct.App.2001). However, "[t]here is no `hard and fast' rule that the best interest of siblings will be served by keeping them together." Copeland v. Copeland, 904 So.2d 1066, 1076(¶ 43) (Miss. 2004). Accordingly, we cannot conclude that the chancellor abused her discretion when she weighed this factor.

CONCLUSION
¶ 62. In conclusion, it is possible that there was not substantial evidence for the chancellor's conclusion that the factor "stability of home and employment of each parent" favored placing Jay in Jason's custody. A reasonable fact-finder could conclude that Candace should have custody of Jay. However, this Court is not allowed to reweigh the facts, and "[w]hile the Albright factors are extremely helpful in navigating what is usually a labyrinth of interests and emotions, they are certainly not the equivalent of a mathematical formula." Lee, 798 So.2d at 1288(¶ 15). "Determining custody of a child is not an exact science." Id. The fact remains that there was substantial evidence for the chancellor's decision. The chancellor was not manifestly wrong or clearly erroneous when she concluded that multiple factors supported placing Jay in Jason's custody. Based on the applicable standard of review, this Court is required to affirm the chancellor's judgment.
¶ 63. THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. CARLTON, J., SPECIALLY CONCURS WITH SEPARATE OPINION, JOINED BY LEE, P.J., AND GRIFFIS, J., AND JOINED IN PART BY ISHEE, J.
CARLTON, J., Special Concurring.
¶ 64. I am writing to express my concern over the disregard for the servicemember defendant's rights, which are set forth in the Servicemembers Civil Relief Act. 50 Appendix U.S.C. § 521 (2006) (SCRA). The purpose of the SCRA is to protect persons in military service from having default judgments entered against them without their knowledge. Wilson v. Butler, 584 So.2d 414, 416 (Miss.1991). In this case, the chancellor did not even consider whether Candace was privy to the statutory protections of the SCRA when it *460 was evident she was serving in the military. While I do not find that this failure requires reversal, I do find that it likely had a detrimental effect on Candace's defense and illustrates the necessity for the court to uphold the legal rights of our nation's servicemembers.

I. The Servicemembers Civil Relief Act.
¶ 65. First, it appears that a judgment was initially entered against Candace even though Jason failed to file the precedent affidavit required by the SCRA. Id. Title 50 Appendix of the United States Code section 521(b)(1)(A)-(B) provides as follows:
In any action or proceeding covered by this section, the court, before entering judgment for the plaintiff, shall require the plaintiff to file with the court an affidavit (A) stating whether or not the defendant is in military service and showing necessary facts to support the affidavit; or (B) if the plaintiff is unable to determine whether or not the defendant is in military service, stating that the plaintiff is unable to determine whether or not the defendant is in military service.
¶ 66. Second, the court failed to appoint an attorney to represent Candace when it was apparent from Jason's petition for custody and a written statement submitted by Candace's mother before trial that she was in military service. The SCRA prohibits entry of judgment against such a defendant until she is appointed counsel by the court. Wilson, 584 So.2d at 417. Title 50 Appendix, section 521(b)(2) of the United States Code provides:
If in an action covered by this section it appears that the defendant is in military service, the court may not enter a judgment until after the court appoints an attorney to represent the defendant. If an attorney appointed under this section to represent a servicemember cannot locate the servicemember, actions by the attorney in the case shall not waive any defense of the servicemember or otherwise bind the servicemember.
¶ 67. Third, the court failed to stay the proceedings on its own motion or find that a stay was not warranted. The SCRA mandates that after a proper determination, a stay shall be granted upon application of counsel or on the court's own motion. Wilson, 584 So.2d at 416; Roberts v. Fuhr, 523 So.2d 20, 28 (Miss.1987); Mathis v. Mathis, 236 So.2d 755, 756 (Miss. 1970). As discussed above, the court failed to properly appoint counsel; thus, it should have moved on its own to determine whether a stay was proper. Title 50 Appendix, section 521(d) of the United States Code provides:
In an action covered by this section in which the defendant is in military service, the court shall grant a stay of proceedings for a minimum period of 90 days under this subsection upon application of counsel, or on the court's own motion, if the court determines that (1) there may be a defense to the action and a defense cannot be presented without the presence of the defendant; or (2) after due diligence, counsel has been unable to contact the defendant or otherwise determine if a meritorious defense exists.
¶ 68. If the court denies a stay, the trial judge must first make a specific finding that the serviceman's ability to conduct his defense is not materially affected by reason of his military service. Wilson, 584 So.2d at 416; Roberts, 523 So.2d at 28; Mathis, 236 So.2d at 756. The record indicates that the court in this case failed to determine whether Candace's military duty materially affected her ability to obtain *461 competent counsel and effectively defend herself.
¶ 69. A review of the complete record indicates it is likely that Candace's defense was materially and detrimentally affected by her military service. Rather than having the advantage of defending against Jason's petition for custody at the outset, Candace was forced to contest an improper entry of default judgment. Additionally, Candace was forced to challenge improper service of process post-judgment, which led to an eventual procedural waiver of this defense when the court entered a temporary order reserving determination of the issue for a final hearing. Then Hurricane Katrina and other unknown reasons delayed the final hearing for nineteen months, and Candace's counsel withdrew three business days before the hearing. Candace obtained new counsel less than one business day before the hearing. At the beginning of the hearing, the new counsel stated he needed more time to prepare, but he failed to enter a motion for a continuance. During a ten minute recess, the chancellor had a discussion with the new counsel, who apparently decided not to return to court after the recess. At this point, Candace proceeded pro se without re-asserting that service was improper. Candace's lack of counsel appears to be the result of an unfortunate sequence of events set in motion only after she was deprived of her SCRA rights.
¶ 70. Further, the record reflects that Candace, in her initial response to the action, raised objections to personal jurisdiction based upon improper service by stating that she was away at basic training when the alleged service took place. It is evident from Jason's petition for custody, a statement on file from Candace's mother, and Candace's initial response that the court was well aware of her military service. However, nowhere does the record reflect that Candace's rights as a servicemember were even noted by the court or that Candace knew she had such rights. In this case, Candace represented herself and should be commended for having the fortitude to conduct her own witness examinations when she ultimately was not able to secure competent counsel for her custody hearing. However, previous decisions by the Mississippi Supreme Court and this Court support a finding that Candace's decision to defend herself pro se on the merits at the final hearing waived her challenge to defective service of process. See Isom v. Jernigan, 840 So.2d 104, 107 (¶¶ 9-11) (Miss.2003); Brown v. Brown, 493 So.2d 961, 963 (Miss.1986); Schustz v. Buccaneer, Inc., 850 So.2d 209, 213 (¶¶ 13-16) (Miss.Ct.App.2003).
¶ 71. Despite the injustice resulting from the court's disregard of the SCRA, Candace may have unknowingly waived her right to relief provided by the act. Judgments entered in noncompliance with the SCRA are not void but are merely voidable and considered valid until properly attacked. Courtney v. Warner, 290 So.2d 101, 103 (Fla.App.1974) and Allen v. Allen, 30 Cal.2d 433, 182 P.2d 551, 553 (1947). Title 50 Appendix, section 521(g)(1)(A)-(B) and (2) of the United States Code provides:
(1) If a default judgment is entered in an action covered by this section against a servicemember during the servicemember's period of military service (or within 60 days after termination of or release from such military service), the court entering the judgment shall, upon application by or on behalf of the servicemember, reopen the judgment for the purpose of allowing the servicemember to defend the action if it appears that (A) the servicemember was materially affected by reason of that military service in making a defense to the action; *462 and (B) the servicemember has a meritorious or legal defense to the action or some part of it. (2) An application under this subsection must be filed not later than 90 days after the date of termination of or release from military service.
¶ 72. Candace never specifically challenged the chancellor's failure to apply the SCRA and did not request a continuance to obtain new counsel or otherwise prepare. Thus, she waived her statutory rights. However, it is likely that Candace was completely unaware of her SCRA rights or her ability to request a continuance.

II. Future Relief for Servicemembers in Child Custody Proceedings.
¶ 73. During the 2008 legislative session, the Mississippi Legislature enacted section 93-5-34 of the Mississippi Code Annotated to address child custody proceedings involving parents in military service. Parents receiving military orders, upon motion to the court, with reasonable advance notice, and for good cause shown, are allowed to present testimony and evidence by affidavit or electronic means in custody and visitation matters. The statute allows such relief when military duties have a material affect on the parent's ability to appear at a regularly scheduled teleconference or access the internet. Miss. Code Ann. § 93-5-34(6) (Supp.2008).
¶ 74. Moreover, the statute provides that temporary duty, mobilization, or deployment of the servicemember and the temporary disruption to the child's schedule should not be factors in a determination of change of circumstances if a motion is filed to transfer custody. Miss.Code Ann. § 93-5-34(3)(b) (Supp.2008).
¶ 75. These provisions became effective on July 1, 2008.
LEE, P.J., AND GRIFFIS, J., JOIN THIS SEPARATE OPINION. ISHEE, J., JOINS THIS SEPARATE OPINION IN PART.
NOTES
[1] Even on the date the final hearing actually occurred, no one could recall why the hearing did not take place as scheduled.
[2] In the chancellor's final judgment, the chancellor stated, in a footnote, that she would have granted a continuance had someone requested one.
[3] Presumably, the year in Tonya's letter is misdated.
[4] We note that Candace did not present any documentary evidence from the United States Army. Candace could have bolstered her position with documentation that set forth the leave she had at that time, including when she was expected to return. Likewise, Candace could have bolstered her position with documentation confirming that she returned to duty as scheduled.
[5] Based on the record presently before us, Jason has not been adjudicated to be the father of the child whom Candace references. We note that Candace presented DNA test results from Reliagene Technologies, Inc., and that those DNA test results purportedly do not exclude Jason as the child's father. Rather, according to Reliagene's test, there is a 99.999% probability that Jason is the child's father. According to Candace, Jason takes issue with the manner in which the DNA test was conducted. We mention this for discussion's sake only, and this discussion is in no way to be construed as an adjudication of the child's paternity.