850 So.2d 161 (2003)
Joan McCoy MESSER, Appellant,
v.
GLen David MESSER, Appellee.
No. 2001-CA-01761-COA.
Court of Appeals of Mississippi.
June 10, 2003.
*164 Shirlee Marie Fager-Baldwin, Hattiesburg, for appellant.
Nancy E. Steen, Hattiesburg, for appellee.
Before KING, P.J., THOMAS and CHANDLER, JJ.
CHANDLER, J., for the court as to issues I, II, IIIA, B, D and E.
¶ 1. Glen and Joan Messer were granted a divorce in the Chancery Court of Lamar County. The parties submitted to the court issues of custody, support, visitation and division of marital assets. Feeling aggrieved, Joan appeals to this Court assigning the following issues on appeal:
I. WHETHER THE CHANCELLOR ERRED IN AWARDING CUSTODY OF THE MINOR CHILD TO GLEN.
II. WHETHER THE CHANCELLOR ERRED IN REDUCING JOAN'S VISITATION.
III. WHETHER THE CHANCELLOR ERRED IN DIVIDING THE ASSETS PURSUANT TO FERGUSON V. FERGUSON.
A. Whether the chancellor erred by not classifying the Lamar County property as a marital asset.
B. Whether the chancellor erred in equally dividing the unfinished marital home between the parties.
C. Whether the chancellor erred in not dividing the Covington County property.
D. Whether the chancellor erred in classifying the Gulf Shores condominium as a marital asset and estimating its appreciation in value.
E. Whether the chancellor erred in assessing the value of the mobile home.
¶ 2. Upon review of the record and legal precedent, we affirm as to Issues I and II and subparts A, B, D, and E of Issue III, and reverse and remand in part as to subpart C of Issue III.

FACTS
¶ 3. Glen and Joan were married on August 14, 1988. Joan had two children from a previous marriage who were over the age of twenty-one and emancipated at the time of the trial. The parties had one child, born December 5, 1990.
¶ 4. Glen and Joan had accumulated land by inheritance and by purchase prior to and during the marriage. Glen inherited approximately eighty-eight acres of land in Lamar County, Mississippi, prior to the marriage. Joan inherited a home in *165 Wayne County, Mississippi, prior to the marriage. She also inherited 288 acres in Clarke County, Mississippi, during the marriage. The parties purchased 110 acres in Covington County, Mississippi, in 1995, and a condominium in Gulf Shores, Alabama, in 1999.
¶ 5. In November of 1999, Joan and Glen separated. On February 4, 2000, Glen filed for divorce on the fault-based grounds of habitual, cruel and inhuman treatment and desertion, and in the alternative, irreconcilable differences. Joan responded by agreeing to a divorce based on irreconcilable differences, but denied that Glen was entitled to a divorce on any of the listed fault-based grounds.
¶ 6. A temporary order was entered on August 2, 2000, awarding primary custody of their son to Glen and providing liberal visitation to Joan. On July 17, 2000, Glen withdrew his petition for divorce on the grounds of habitual, cruel and inhuman treatment and desertion, and agreed to proceed with the divorce action on the grounds of irreconcilable differences. The parties reserved to the chancellor the issues of child custody, support, visitation and division of marital assets. On October 11, 2001, the chancellor entered his judgment, and Joan filed for an appeal on November 6, 2001.

LAW AND ANALYSIS
I. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION AND WAS MANIFESTLY IN ERROR BY AWARDING CUSTODY OF THE MINOR CHILD TO GLEN.
¶ 7. The chancellor awarded Glen and Joan joint legal custody of their son with primary physical custody granted to Glen. Joan was provided with certain visitation privileges. Joan appealed the decision claiming the chancellor erred in not granting her primary custody of the child.
¶ 8. "In the difficult matter of determining child custody in divorce proceedings, the chancellor is necessarily vested with substantial discretion." McWhirter v. McWhirter, 811 So.2d 397, 399(¶ 4) (Miss.Ct.App.2001). Because of the latitude given the chancellor, this Court when reviewing a chancellor's child custody ruling, will only reverse where the chancellor committed manifest error, acted in a way that is clearly erroneous or applied an erroneous legal standard. Passmore v. Passmore, 820 So.2d 747, 749(¶ 5) (Miss.Ct.App.2002).
¶ 9. In a child custody case, the chancellor must keep the best interest of the child as his paramount concern. Albright v. Albright, 437 So.2d 1003, 1004 (Miss.1983). The Mississippi Supreme Court established eleven factors to aid our courts in making the determination of what is in the best interest of the child:
(1) age, health and sex of the child;
(2) a determination of the parent that has had the continuity of care prior to the separation;
(3) which has the best parenting skills and which has the willingness and capacity to provide primary child care;
(4) the employment of the parent and responsibilities of that employment;
(5) physical and mental health and age of the parents;
(6) emotional ties of parent and child;
(7) moral fitness of the parents;
(8) the home, school and community record of the child;
(9) the preference of the child at the age sufficient to express a preference by law;
(10) stability of home environment and employment of each parent and
*166 (11) other factors relevant to the parent-child relationship.
Id. at 1005.
¶ 10. In order for this Court to properly review the chancellor's decision, the chancellor must consider and discuss each factor when rendering his opinion. Powell v. Ayars, 792 So.2d 240, 244(¶ 9) (Miss.2001).
¶ 11. The chancellor indicated that both parents were fit to exercise custodial responsibilities. As to eight of the eleven Albright factors, the chancellor concluded that the factors were irrelevant or that the evidence did not appear to particularly favor either parent. However, the chancellor concluded that certain factors, the providing of primary child care, the continuity of care, and the child's age, weighed in Glen's favor.
(1) PRIMARY CHILD CARE AND PARENTING SKILLS
¶ 12. The chancellor found that both parents were willing to provide primary care to their child. Despite this finding, the chancellor concluded that this factor slightly favored Glen.
¶ 13. Both parties' witnesses testified to the love and care each provided. However, Glen indicated that when their child was a baby he provided sixty-five to seventy percent of the primary care. While it is true that both parents exhibited good parenting skills, the chancellor concluded that, given the totality of the circumstances, Glen exhibited more of the primary caretaker role.
¶ 14. Joan asserts that she has the better parenting skills because she attends church on a regular basis. Glen did acknowledge that he did not attend church on a regular basis but stated that his sister would take his son to church. The Mississippi Supreme Court noted that parental religious differences cannot "be the sole basis for custody decisions." Hollon v. Hollon, 784 So.2d 943, 947(¶ 12) (Miss. 2001).
(2) CONTINUITY OF CARE
¶ 15. Glen and Joan have careers as educators. However, Joan is involved in a partnership with her family called McCoy & McCoy Investments which requires some of her time. Under this factor, the chancellor indicated that Joan's other business interests could potentially interfere with her ability to care for the child. Therefore, the chancellor concluded that this factor favored Glen.
¶ 16. Joan argues that the chancellor overlooked the fact that Glen's schedule interferes with his ability to care for the child. Joan states that, unlike Glen, her schedule allows her to be home when her son comes home from school. She indicates that Glen's weekday schedule requires him to be at work until 5:00 p.m. and to facilitate a night lab one night per week. Joan said during these periods of Glen's absence, their child is watched by Glen's seventy-one-year-old sister, Patsy Ruth Sanders. Patsy lives next door to the Messer's home. Joan expressed concern for Patsy's lack of transportation and her health condition.
¶ 17. In reviewing the record, this Court does not foresee a real danger for the child while in the care of his aunt. It would be a dangerous precedent for this Court to state that caregivers without a means of transportation are a threat to children. Also, Joan's argument that Patsy is unsuitable to care for their son because of her health problems lacks merit. Patsy only takes medication for arthritis and inner ear problems. These health concerns do not rise to the level of creating an unsafe environment for the child.
¶ 18. Although the chancellor did not discuss the significance of Patsy's presence *167 in the child's life, we find it an important factor in weighing the determination of child custody. This Court has held that the presence of extended family is a legitimate factor to support awarding custody to a parent. Neville v. Neville, 734 So.2d 352, 355(¶ 10) (Miss.Ct.App.1999). The presence of Patsy may help provide stability in the child's life following the trauma of his parent's divorce.
(3) AGE, SEX AND HEALTH OF THE CHILD
¶ 19. At the time of the divorce, Glen and Joan's son was ten years old. The chancellor determined that the age and sex of the child strongly favored custody to Glen. The chancellor stated that during this stage of life the child needed the "guidance and influence of the father." This Court has held this to be a valid concern in determining custody. See Hassett v. Hassett, 690 So.2d 1140, 1149 (Miss. 1997) (granting custody of six-year-old son to father because "child was entering an age when male guidance [was] needed").
¶ 20. This Court finds Joan's arguments unpersuasive on this issue. The chancellor "has substantial discretion in such matters and must often make difficult decisions when he is satisfied that both parents are loving and genuinely concerned with the child's well-being." Robinson v. Jackson, 794 So.2d 290, 293(¶ 8) (Miss.Ct.App.2001).
II. WHETHER THE CHANCELLOR ERRED IN REDUCING JOAN'S VISITATION.
¶ 21. Joan argues, in the alternative, that the court erred in reducing her visitation in the final order from the temporary order. Joan's temporary visitation schedule provided her with one weekday per week, all but one weekend per month and six weeks during the summer. The chancellor stated in his final judgment that Joan shall have "liberal visitation" and it shall consist of at the minimum, alternating weekends, six weeks in the summer, and certain holidays.
¶ 22. This Court stated that liberal visitation, at a minimum, means two weekends a month and five weeks during the summer. Chalk v. Lentz, 744 So.2d 789, 792(¶ 9) (Miss.Ct.App.1999). We find no merit to this issue.
III. WHETHER THE CHANCELLOR ERRED IN DIVIDING THE ASSETS PURSUANT TO FERGUSON V. FERGUSON.
¶ 23. "This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Bell v. Parker, 563 So.2d 594, 596-97 (Miss.1990). "Such division and distribution will be upheld if it is supported by substantial credible evidence." Bunyard v. Bunyard, 828 So.2d 775, 776(¶ 5) (Miss.2002).
¶ 24. Prior to dividing the assets of the divorcing party, the chancellor must first classify the parties' assets as marital or non-marital. Boutwell v. Boutwell, 829 So.2d 1216, 1220(¶ 19) (Miss. 2002). Only marital property is subject to equitable division. Hemsley v. Hemsley, 639 So.2d 909, 914 (Miss.1994). "Marital property can be defined as that which was acquired during the course of the marriage." Boutwell, 829 So.2d at 1220(¶ 19) (citing Waring v. Waring, 747 So.2d 252, 255(¶ 14) (Miss.1999)).
¶ 25. Second, the chancellor divides the marital assets equitably by applying factors set forth by the Mississippi Supreme Court in Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994). These factors include:
(1) economic and domestic contributions by each party to the marriage,
*168 (2) expenditures and disposal of the marital assets by each party,
(3) the market value and emotional value of the marital assets,
(4) the value of the non-marital property,
(5) tax, economic, contractual, and legal consequences of the distribution,
(6) elimination of alimony and other future frictional contact between the parties,
(7) the income and earning capacity of each party, and
(8) any other relevant factor that should be considered in making an equitable distribution.
Selman v. Selman, 722 So.2d 547, 552(¶ 16) (Miss.1998).
¶ 26. Third, if the marital property, "after equitable division and in light of the non-marital assets, will adequately provide for both parties, then no more need be done." Drumright v. Drumright, 812 So.2d 1021, 1025(¶ 9) (Miss.Ct.App.2001). However, if the distribution of the assets does not adequately provide for the parties, "then alimony should be considered."
Id.
A. Whether the chancellor erred by not classifying the Lamar County property as a marital asset.
¶ 27. In 1990, the parties moved onto land Glen inherited in Lamar County, Mississippi. The land consisted of two separate parcels. The first was a four acre plot which Glen had inherited from his uncle in 1976. The parties lived in their mobile home on this land until their separation in 1999.
¶ 28. The other parcel of land was adjacent to the four acre plot and consisted of approximately eighty-four acres which Glen had inherited from his father in 1977. This larger piece of property contained an old residence which the parties began to renovate. Their plan was for it to be their marital home. This residence at the time of the trial was not complete nor habitable.
¶ 29. The parties paid property taxes for the Lamar County land out of a joint account. They also placed the proceeds from a timber sale from the land into a joint account.
¶ 30. During the marriage, Joan inherited 288 acres in Clarke County, Mississippi. Both parties testified to paying the land's property taxes out of a joint account. They also stated that the proceeds from a timber sale off this land was placed in a joint account.
¶ 31. Prior to the separation, Joan deeded the Clarke County land to the partnership, McCoy & McCoy Investments. The partnership also held land in Jasper and Wayne County, Mississippi. The chancellor held that the land Joan had inherited and her interest in the family partnership were non-marital assets.
¶ 32. The chancellor also held that except for the unfinished home, the Lamar County land was to be Glen's separate property. The chancellor stated,
[t]here is nothing shown to have transpired with respect to that real property during the marriage that leads the Court to conclude that such remaining real property has been co-mingled or otherwise converted to a marital asset, but rather should be considered and treated by the Court as separate property of Glen.
¶ 33. Joan asserts that the chancellor erred in ruling that only the parties' unfinished home located on the Lamar County property was a marital asset. She states that the entire estate was utilized for familial purposes and use.
¶ 34. This Court has stated that non-marital assets, "such as inheritances, may *169 be converted into marital assets if they are commingled with marital property or utilized for domestic purposes, absent an agreement to the contrary." Boutwell, 829 So.2d at 1221(¶ 20). The evidence shows the Lamar County property was co-mingled with the parties' marital assets. The chancellor therefore applied an erroneous legal standard in determining that the Lamar County property was a non-marital asset.
¶ 35. However, as the Mississippi Supreme Court has held, an exception exists when a chancellor utilizes the wrong legal standard in determining the division of property. Tillman v. Tillman, 716 So.2d 1090, 1095(¶ 23) (Miss.1998) (affirming the chancellor's ruling even though the chancellor erroneously held the husband's pension plan to be a non-marital asset). The court held that an appellate court is charged only with determining whether an "equitable result was reached." Id. at 1095(¶ 25).
¶ 36. At the conclusion of the court's distribution of marital assets, Glen received a total value of $127,500 and Joan received a total value of $127,000. The court noted that Joan's retirement account held $52,400, while Glen's accumulated retirement account was valued at $49,000. When viewing the overall property division, it shows that Joan received an equitable distribution of the marital property, even though she did not receive a larger portion of the Lamar County property. There is no manifest error in the chancellor's distribution of the parties' assets.
B. Whether the chancellor erred in equally dividing the unfinished marital home between the parties.
¶ 37. Joan asserts that the chancellor erred in not awarding her more than half of the value of the house due to her financial contribution. Specifically, she states that the chancellor overlooked her contribution of $30,000 to the remodeling of the home. The record indicates that this money was deposited into a joint account, but does not reveal for what purpose the proceeds were used.
¶ 38. In adjusting property division between parties, the chancellor should be afforded considerable latitude. Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss.1995). In assessing the distribution of property, the chancellor may take into consideration the "substantial contribution to the accumulation of the property." Ferguson, 639 So.2d at 928. It is evident that the Lamar County property along with the old residence was acquired through Glen's inheritance. This significant contribution cannot be outweighed by Joan's deposit into the parties' joint account. Therefore, this issue is without merit.
D. Whether the chancellor erred in classifying the Gulf Shores condominium as a marital asset and estimating its appreciation in value.
¶ 39. In February 1999, nine months prior to the parties' separation, Joan and Glen purchased a condominium in Gulf Shores for $65,000. Until the separation, the parties' made payments on the property out of a joint account. After the separation, Joan made the payments out of a separate account. At the time of trial, $22,000 had been paid on the property.
¶ 40. Glen testified that he made significant improvements to the condominium prior to the separation. The chancellor held that the property was a marital asset and had appreciated in value by $10,000. The chancellor concluded that the property had $32,000 in equity.
¶ 41. Joan argues that the trial court erred in holding that the property was a marital asset because of her payments on the property following the separation. *170 However, substantial evidence supports the chancellor's decision because the property was bought during the marriage, numerous payments were made out of a joint account, and Glen made significant improvements to the property. Furthermore, this issue lacks merit considering the judge distributed all of the equity to Joan, and gave her complete ownership and possession of the property.
¶ 42. Joan also maintains that the chancellor erred in his estimation of the appreciation of the property. She states that there was no testimony or documentation which reflects the condominium's value appreciating to $75,000. The valuation of the property is a question of fact. Ward v. Ward, 825 So.2d 713, 719(¶ 21) (Miss.Ct.App.2002). "[M]atters of fact are within the chancellor's discretion and will not be reversed absent a finding that the chancellor was manifestly wrong." Id.
¶ 43. After reviewing the record, it is clear that the parties failed to present evidence to the court that would establish the property's value. This Court has held that when a chancellor makes a valuation judgment based on proof that is less than ideal, it will be upheld as long as there is some evidence to support his conclusion. Dunaway v. Dunaway, 749 So.2d 1112, 1121(¶ 29) (Miss.Ct.App.1999). "To the extent that further evidence would have aided the chancellor in these decisions, the fault lies with the parties and not the chancellor." Ward, 825 So.2d at 719(¶ 21). Based on the evidence presented at trial, the chancellor did not abuse his discretion in his estimation of the property's appreciation in value.
E. Whether the chancellor erred in assessing the value of the mobile home.
¶ 44. Joan asserts that the judge created manifest error in accepting $7,500 as the appraised value of the parties' mobile home. Scott Pierce, a licensed appraiser of sixteen years, testified for Joan that the mobile home was worth $7,500. Substantial evidence supports the chancellor's determination that the mobile home was worth $7,500. This issue is without merit.
McMILLIN, C.J., WRITING FOR THE COURT AS TO ISSUE III-C:
¶ 45. Joan urges this Court to conclude that the chancellor erred when he failed to divide in some way a marital asset consisting of 110 acres of land in Covington County. The parties had purchased the property in 1995 and held title as joint tenants. In making his division of marital assets, the chancellor noted the joint ownership, found as fact that the land was a marital asset, but decided to leave the parties as joint tenants; effectively dividing the property equally but without a partition or other actual division of the property. The chancellor found as follows:
The Court, in making what it considers and finds to be equitable, undertakes to leave the parties as co-owners of property to the least extent possible.... [T]he Court proceeds to leave only the Covington County property, valued at $175,000.00, titled equally to Glen and Joan each, allocating to each a dollar value of $87,500.00.
¶ 46. Citing considerations in Ferguson that one of the goals of equitable division is "to conclude the parties' legal relationship," Joan argues that the chancellor should have somehow more finally resolved the rights of the parties in this property. Id. at 929. We do not find that this decision rises to the level of a manifest abuse of discretion, which is the standard required to reverse the chancellor's decision in matters such as this. Vaughn v. Vaughn, 798 So.2d 431, 433(¶ 9) (Miss. 2001).
*171 ¶ 47. It is not uncommon, though admittedly it is normally done in the case of the marital domicile, for a divorce judgment to leave the parties as joint owners of property for the present, with the anticipation that, at some point in the future, common ownership will be dissolved as the situation changes, either by agreed disposition or through a partition action.
¶ 48. In the case of this land, the decision to leave the property in joint ownership for the present had the effect of an equal division of the property without the need for a forced sale or an immediate division in kind that may or may not have proven ultimately beneficial to the parties. The decision leaves the parties with some flexibility to continue to hold the property as a potential investment and to dispose of the property by some mutually agreeable means in the near or distant future. Even in the event the parties would find themselves unable to agree to a mutually-satisfactory disposition of the property, either one could, at any point, finally resolve the ownership question by simply bringing a partition action, which is one of the more straight-forward judicial proceedings that does not generally invoke the sort of passion-inflaming issues that can arise in other forms of litigation. There is the added consideration that Glen, in his testimony, had mentioned that the parties had previously investigated purchasing land as an investment to help defray the cost of their child's education. While the chancellor's ruling did not specifically mention this consideration, it is beyond question that the decision to leave title to the property undisturbed at the least preserved the possibility that the property would be available for this purpose.
¶ 49. In short, though perhaps persuasive arguments can be made for an immediate end to this joint ownership, a contrary decision in this instance does not, in our view, constitutes the sort of abuse of the wide discretion afforded the chancellor in such matters that would compel us to reverse. Rather, the decision to maintain the status quo appears to be one that the chancellor reached only after affirmatively concluding that continued joint ownership was appropriate. In light of the fact that there was testimony regarding a potential future use of the property that would, at least arguably, be desirable for both parties, we find this aspect of the judgment to be within the range of discretion afforded the chancellor and, thus, beyond the authority of this Court to disturb.
¶ 50. THE JUDGMENT OF THE CHANCERY COURT OF LAMAR COUNTY IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
CHANDLER, J., AS TO ISSUES I, II, IIIA, B, D AND E: McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, IRVING, MYERS, AND GRIFFIS JJ., CONCUR. McMILLIN, C.J., AS TO ISSUE IIIC: SOUTHWICK, P.J., THOMAS, LEE AND MYERS, JJ., CONCUR. CHANDLER, J., DISSENTS AS TO ISSUE IIIC: KING, P.J., BRIDGES, IRVING, AND GRIFFIS, JJ., JOIN.
CHANDLER, J., DISSENTING IN PART:
¶ 51. With respect for my colleagues in the majority I find that I am in disagreement with the holding in issue III-C, therefore, I dissent. Joan argues and this writer agrees that the chancellor erred in not dissolving the joint ownership of the property as it leaves the door open to future conflicts that could result in further litigation. The Mississippi Supreme Court in Ferguson v. Ferguson, 639 So.2d 921, 929 (Miss.1994), held that the goal of equitable distribution is not only to fairly divide *172 the marital assets but also to "conclude the parties' legal relationship." In light of this holding it stands to reason that in the absence of clearly articulated reasons to not conclude the parties' legal relationship, to not do so can only be characterized as an arbitrary and capricious act constituting abuse of discretion. The chancellor articulated no findings necessitating the continuation of the parties' legal relationship with regard to this property; therefore, the relationship should have been concluded. Id.
¶ 52. The majority opinion states that "Glen, in his testimony, had mentioned that the parties had previously investigated purchasing land as an investment to help defray the cost of their child's education. While the chancellor's ruling did not specifically mention this consideration, it is beyond question that the decision to leave title to the property undisturbed at the least preserved the possibility that the property would be available for this purpose." The fact of the matter is that the chancellor gave no indication at all as to why he ruled as he did. Furthermore, even if the chancellor's intention was to, as stated by the majority opinion, "at least preserve the possibility that the property would be available for this purpose," then it smacks even more of abuse of discretion because there is nothing in the jurisprudence of this state that would allow this kind of arbitrariness to defeat the dictates of Ferguson to conclude the parties' legal relationship.
KING, P.J., BRIDGES, IRVING AND GRIFFIS, JJ., JOIN THIS SEPARATE WRITTEN OPINION.