CHANDLER, J.,
 

 for the Court.
 

 ¶ 1. Following a trial on the issue of custody of the minor child, Jake,
 
 [1]
 
 the Chancery Court of DeSoto County entered a decree which granted a divorce on the ground of irreconcilable differences to Jake’s parents, Steven (Steve) and Melan-nie Collins. The chancellor also approved the proposed property division between the parties. Regarding the custody of Jake, the chancellor applied the
 
 Albright
 
 factors to the facts and awarded joint physical and legal custody to both parents, with Jake to reside with Melannie during the school year and to reside with Steve during the summer. Aggrieved by the chancellor’s decision, Steve appeals. He raises the following assignments of error:
 

 I. The chancellor did not properly apply the
 
 Albright
 
 factors in awarding joint physical and legal custody.
 

 II. The chancellor’s custody award did not satisfy the requirements for joint physical custody.
 

 III. The chancellor did not properly consider the testimony of the guardian ad litem.
 

 ¶ 2. Finding no error, we affirm.
 

 FACTS
 

 ¶ 3. Steve and Melannie married on August 21, 1998. Their child, Jake, had already been born on September 19, 1997, and Melannie also had an older special-needs daughter that she brought into the marriage. At the time of the hearing in this case, Jake was nine years old, and Melannie’s daughter was thirteen. After Jake’s birth, the couple moved to Grenada, Mississippi; they moved to Hernando, Mississippi in 2003. Throughout the marriage, Steve and Melannie worked a number of jobs. Steve worked as a fireman, an ambulance driver, and a paramedic. Melannie worked as a registered nurse, and later she became a paramedic. At the time of the hearing, she worked as a flight nurse in Memphis.
 

 ¶ 4. Throughout the marriage, Steve and Melannie worked long shifts, sometimes twelve or twenty-four hours at a time. They managed to schedule their shifts so that one of them was usually at home to care for the children while the other was working. Each of the parties admitted that they jointly cared for the children until the separation.
 

 ¶ 5. Melannie admitted to having an affair that began in December 2004 and
 
 *686
 
 lasted through January 2005. When Steve learned of the affair, he and Melannie argued, but they decided to try to work through the situation. Despite their attempted reconciliation, Melannie decided to move out of the marital home on March 1, 2005. With Jake, her daughter, and most of the household furnishings, Melan-nie moved to Pope, Mississippi. About a week later, Melannie returned the children to the marital home; she testified that she did this in order to work extra hours to pay off marital debt. Melannie left the children with Steve for a few weeks; however, she later returned and carried her daughter to Pope to live with her. Melan-nie left Jake in Hernando under Steve’s care.
 

 ¶ 6. On March 14, 2005, Steve filed a complaint in the Chancery Court of DeSo-to County requesting a divorce on the grounds of adultery and habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. He also sought an order granting him temporary custody of Jake. Melannie answered with a counterclaim for divorce on the ground of habitual cruel and inhuman treatment or irreconcilable differences. Jake continued to live with Steve in Hernando and attend school in Hernando. Melannie brought Jake to her home in Pope several nights per month.
 

 ¶ 7. On August 17, 2006, the chancellor appointed a guardian ad litem based upon Melannie’s submission of pictures of bruises on Jake; Melannie asserted the bruises came from a spanking administered by Steve in April 2006. On the same day, the chancellor entered a temporary agreed order granting the parties joint legal and physical custody of Jake, allowing them alternating time with Jake of three and four days per week. Steve and Melannie eventually stipulated to an irreconcilable differences divorce and agreed to a division of the marital property. They submitted the following issues to the chancellor for determination: custody of Jake, visitation, child support, and college expenses. The chancellor held a trial on these issues on January 10, 2007.
 

 ¶ 8. At trial, Steve called six witnesses including: (1) himself; (2) his mother, Zula L. Pafford; (3) Melannie; (4) Jake’s baseball and soccer coach, John Wesley Pickle; (5) one of Steve’s childhood friends, Wilton Davis; and (6) a friend who often took care of Jake while Steve was at work, William Allen Magee.
 

 ¶ 9. Steve testified that he had spanked Jake twice, including in April 2006, but he denied that he ever spanked Jake hard enough to have caused any bruises. He testified that he allowed Jake to play with other children at his apartment complex, but he made sure Jake checked in with him every thirty minutes.
 

 ¶ 10. Magee recounted that on the ten days per month that Steve worked a twenty-four-hour shift, Jake stayed with Ma-gee, his wife, and their five children. Ma-gee also coached Jake in baseball. He testified that from his observations Steve was a good father.
 

 ¶ 11. Pafford testified that she took care of Jake a few times each month. She lived in Grenada, but she drove to Hernan-do to stay with Jake when Steve was working. She believed that Steve was doing a good job rearing Jake. However, she admitted that she had not observed Melan-nie’s parenting skills. On cross-examination, Melannie’s attorney brought out that Steve’s mother was eighty-one years old and had to drive for one hour to take care of Jake.
 

 ¶ 12. Pickle was Jake’s baseball and soccer coach from about 2004 until 2006. According to Pickle, Steve was normally the person who brought Jake to all of the
 
 *687
 
 practices and games. Pickle remembered that Melannie and Pafford brought Jake to some of the games. From his experience with Jake, Pickle believed that he was a great kid who was very respectful. Pickle said that he never saw Steve lose his temper with Jake.
 

 ¶ 13. Steve’s childhood friend, Davis, was the last to testify on Steve’s behalf. He testified that he had known Steve since the second grade, and he had recently gone hunting with Steve and Jake. Davis told the chancellor that Steve was a good parent who controlled his temper well.
 

 ¶ 14. Melannie testified on her own behalf and also called her mother, Susan Vance, and a former coworker, Stephanie Thompson. Melannie testified that Steve had anger issues and inconsistently disciplined Jake. She testified that the day after Steve spanked Jake, she visited Jake at his school. She testified that both she and the principal observed bruises on Jake, which prompted the principal to call the Mississippi Department of Human Services (DHS).
 
 [2]
 
 Melannie photographed the bruises later that day. She also testified that she did not make Jake responsible for the care of his developmentally-challenged half-sister, but Jake is one of the few people who can communicate with his half-sister, and he looks out for her. She testified that she has a friend whom she pays to take care of her daughter while she is at work.
 

 ¶ 15. Melannie’s mother, Vance, testified that she sometimes cared for the children before the parties separated. Vance said she was familiar with Melannie’s parenting sífilis and found her to be a good mother. Vance also told the chancellor about the close relationship between Jake and his half-sister and about Melannie’s living arrangements in Pope. Vance testified that Melannie lives in a house on the campus of the Pope School, which teaches kindergarten through the eighth grade. Vance testified that she is the principal of the Pope School, and the school has an excellent educational reputation. Vance further testified that after school, Jake plays on the campus with his cousins, who live five minutes away with Jake’s aunt and uncle.
 

 ¶ 16. Thompson testified that she became friends with Melannie when they began working together in 2003. She said she had observed Melannie taking care of her children, and she believed that Melan-nie was a good parent. She was also aware of some instances when Steve had been derogatory to Melannie in front of the children. Like Vance, Thompson thought that Jake and his half-sister adored each other and had a close relationship.
 

 ¶ 17. At the close of the trial, the guardian ad litem stated that she did not find sufficient evidence of any child abuse. Upon questioning by Steve’s attorney, she noted that she had some concerns relating to both parents. Regarding Steve, the guardian ad litem testified that Melannie had expressed a concern about Jake running around the apartment complex with older children; upon investigation of the situation, the guardian ad litem concluded that Steve made the appropriate supervision corrections. Also, the guardian ad litem found that Steve had established an earlier bedtime for Jake, which effectively addressed Jake’s teacher’s concern about Jake being tired at school. Regarding Melannie, the guardian ad litem was concerned that Melannie had left the children
 
 *688
 
 with Steve when she moved out of the marital home, which contradicted Melan-nie’s assertion that she always put the children first. Also, the guardian ad litem was concerned that Jake’s relationship with his developmentally-ehallenged half-sister might inappropriately burden him with responsibility.
 

 The Chancellor’s Custody Decision
 

 ¶ 18. In the chancellor’s opinion, issued on March 1, 2007, the chancellor considered each of the
 
 Albright
 
 factors, including: (1) the age, health, and sex of the child; (2) a determination of which parent had the continuity of care prior to the separation; (3) which parent has the best parenting skills; (4) which parent has the willingness and capacity to provide primary child care; (5) the employment and employment responsibilities of each parent; (6) physical health, mental health, and age of the parents; (7) emotional ties of parent and child; (8) moral fitness of parents; (9) the child’s home, school, and community record; (10) the child’s preference at an age sufficient to express a preference by law; (11) stability of the home environment; and (12) any other factors relevant to the parent-child relationship.
 
 Albright v. Albright,
 
 437 So.2d 1003, 1005 (Miss. 1983).
 

 ¶ 19. The chancellor found both Steve and Melannie to be good parents, noting: “This is a hard case for this Court to decide. It’s a very, very close call, and, frankly, it’s kind of like that, when you have got two people that want custody of the child and both of them are good parents.”
 

 ¶ 20. The chancellor found that four
 
 Albright
 
 factors favored Steve. First, the chancellor found that Jake needed a strong male influence in his life; therefore, the health and sex of the child weighed in favor of Steve. Similarly, the continuity of care weighed in favor of Steve because, although both parties jointly cared for Jake before the separation, Steve had cared for Jake during the majority of the time after Melannie left the marital home. The chancellor found that the moral fitness factor favored Steve because of Melannie’s admitted affair. Finally, the chancellor found that Jake’s home, school, and community record favored Steve because Jake had lived in Hernando since 2003, and he did well in school and participated in a number of extracurricular activities there.
 

 ¶ 21. Of the remaining factors, the chancellor found that four factors weighed in favor of Melannie. Relying on the testimony of Thompson, and on the evidence concerning Steve’s temper and discipline of Jake, the chancellor found that Melan-nie had the better parenting skills, “especially with the relationship, instruction, education!,] and discipline.” The chancellor also found Melannie had more willingness and capacity to provide primary child care. In making this finding, the chancellor stated that both parents were capable of caring for Jake, but: (1) Melannie worked an average of two fewer twenty-four-hour shifts each month, (2) Melannie basically lived on Jake’s school campus in Pope, and (3) Melannie had extended family very close by to assist with Jake’s care. On the other hand, Steve planned on getting a second job, and he relied on his elderly mother to drive from Grenada to help care for Jake.
 

 ¶ 22. The chancellor also found that Jake’s home, school, and community record; the stability of the home environment; and the employment of the parents favored Melannie. The chancellor specifically noted the presence of extended family near Melannie’s home, including Jake’s grandmother and his aunt, uncle, and cousins who lived five minutes away. The chancellor further noted that Jake played with a cousin after school while supervised
 
 *689
 
 by his mother and grandmother, and that Melannie’s job required her to be out of the home only two days per week. The chancellor expressed his concern with Steve’s temper, although he noted that the guardian ad litem had found no merit to the abuse allegation. The chancellor also found that an “other factor” favored Me-lannie in the form of the close relationship between Jake and his half-sister.
 

 ¶ 23. The chancellor found four
 
 Al-bright
 
 factors to be inapplicable or equally favorable to each parent. Both parents worked similar jobs with similar hours, so their employment responsibilities, considered alone, favored neither parent. Similarly, both parents were in good physical and mental health, and both exhibited strong emotional ties to Jake. Lastly, the chancellor noted that Jake was not yet twelve years old, so he was not of sufficient age to express a preference as to which parent he wished to live with.
 

 ¶ 24. Ultimately, the chancellor decided that it was in Jake’s best interest for his parents to share joint legal and joint physical custody. The chancellor’s
 
 Albright
 
 findings indicate that he was impressed by the quality of the Pope School and by the presence of Jake’s extended family in Pope. Therefore, he ordered Jake to live with Melannie in Pope each school year and to live with Steve in Hernando each summer. The specifics of the custodial schedule will be discussed in more detail in our analysis of the issues raised on appeal.
 

 ¶ 25. Following the chancellor’s bench opinion, the chancellor entered a final decree of divorce on April 12, 2007. The judgment granted the parties a divorce, approved their agreed-upon property division, and memorialized the findings from the bench opinion in a final judgment. From the final judgment of divorce, Steve perfected this appeal.
 

 STANDARD OF REVIEW
 

 ¶ 26. “[The appellate court] will not disturb a chancellor’s judgment when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.”
 
 Chapel v. Chapel,
 
 876 So.2d 290, 292(¶8) (Miss. 2004). Under this standard of review, our purpose is to determine whether the chancellor’s ruling was supported by credible evidence, not whether we agree with that ruling.
 
 Lee v. Lee,
 
 798 So.2d 1284, 1290(¶ 22) (Miss.2001).
 

 ANALYSIS OF THE ISSUES
 

 I. The Chancellor’s Application of the
 
 Albright
 
 Factors
 

 ¶27. In his first assignment of error, Steve takes issue with the chancellor’s application of the
 
 Albright
 
 factors to the evidence. Steve claims that the chancellor erred by finding that four of the factors favored Melannie and that two of the factors were neutral. We will only address the
 
 Albright
 
 findings with which Steve takes issue, remaining mindful that “the polestar consideration in child custody cases is the best interest and welfare of the child.”
 
 Albright,
 
 437 So.2d at 1005.
 

 A. Best Parenting Skills
 

 ¶ 28. Steve argues that the chancellor erred by finding that, due to Steve’s temper and his failure to properly discipline Jake, Melannie was the parent with better parenting skills. Steve contends that in making this finding, the chancellor relied too heavily on the testimony of Me-lannie’s former coworker, Thompson. Steve claims that Thompson’s knowledge of Melannie’s parenting skills was limited because she used qualifying phrases such as “to my knowledge.”
 

 ¶ 29. We disagree with Steve’s assessment of the chancellor’s findings on this
 
 *690
 
 factor. Melannie introduced testimony about Steve’s temper and his inconsistent discipline; there was no error in the chancellor’s reliance on that evidence about Steve. It was within the chancellor’s discretion to weigh Thompson’s credibility as a witness to Melannie’s parenting skills. We find that the chancellor’s decision that Melannie had the best parenting skills was supported by substantial evidence.
 

 B.Willingness and Capacity to Provide Primary Child Care
 

 ¶ 30. Steve argues that the chancellor incorrectly found that Melannie demonstrated more willingness and capacity to provide primary child care. Steve argues that Melannie’s schedule was not more flexible than his own, and that the chancellor incorrectly penalized him because none of Jake’s extended family lived nearby. To support this argument, Steve cites
 
 Watts v. Watts,
 
 854 So.2d 11, 15(¶14) (Miss.Ct.App.2003), in which this Court stated that a mother should not have been penalized in a custody decision for her lack of an extended family in the area.
 

 ¶ 31. “[T]he presence of extended family is a legitimate factor to support awarding custody to a parent.”
 
 Messer v. Messer,
 
 850 So.2d 161, 167(¶ 18) (Miss.Ct. App.2003) (citing
 
 Neville v. Neville,
 
 734 So.2d 352, 355(¶ 10) (Miss.Ct.App.1999)). In discussing the very argument Steve currently advances, we stated in
 
 Gilliland v. Gilliland,
 
 969 So.2d 56, 71 (¶¶ 52-53) (Miss.Ct.App.2007), that Watts “does not demand our departure from” the principle that the presence of an extended family is a legitimate consideration. The chancellor properly took into account the fact that extended family members live very close to Melannie and Jake in Pope. The proximity of extended family members is especially relevant in this case because both parents relied extensively on childcare provided by others during their twenty-four-hour work shifts.
 

 ¶ 32. The chancellor also correctly took into account the testimony that Steve generally worked two more twenty-four-hour shifts per month than Melannie, and that Melannie worked a more flexible schedule that allowed her to switch shifts whenever necessary.
 
 [3]
 

 C. Employment of the Parents and Re- ■ sponsibilities of that Employment
 

 ¶ 33. Both Steve and Melannie were employed in similar careers with fairly similar time requirements. We find no error in the chancellor’s determination that, based solely on their employment, this factor favored neither parent.
 

 D. Emotional Ties of the Parent and Child
 

 ¶ 34. There was no error in the chancellor’s finding that there was a strong bond between Jake and each of his parents.
 

 E. Stability of the Home Environment and Employment of Each Parent
 

 ¶ 35. Steve argues that the chancellor erred by finding that this factor favored Melannie because of Melannie’s living arrangement on the Pope School’s campus and the small-town atmosphere of Pope. Steve also cites to Watts in arguing that the chancellor incorrectly considered
 
 *691
 
 the presence of Melannie’s extended family-in Pope.
 

 ¶ 36. We find no merit to Steve’s arguments concerning this factor. We have already considered and rejected Steve’s argument concerning
 
 Watts.
 
 Furthermore, the guardian ad litem noted that Jake had an excellent living and schooling arrangement in Pope. Melannie testified concerning her home’s close proximity to Jake’s school and the presence of family members who cared for Jake while Melan-nie was at work. We find there was substantial evidence in support of the chancellor’s decision that this factor favored Melannie.
 

 F. Other Factors-Separation of the Siblings
 

 ¶ 37. Finally, Steve takes issue with the chancellor’s determination that it would have an adverse impact on Jake to separate him from his half-sister. Steve cites
 
 C.W.L. v. R.A.,
 
 919 So.2d 267, 273(¶ 21) (Miss.Ct.App.2005) in support of this argument. In
 
 C.W.L.,
 
 this Court stated that “there is no general rule in this state that the best interest of siblings is served by keeping them together.”
 
 Id.
 
 However, further addressing this issue, we stated the following:
 

 While the placement of children with their siblings is not a concern that “overrides” the best interest of the child, our case law makes it clear that keeping siblings together is assumed to be in the best interest of a child, absent a showing that the circumstances in a particular case are to the contrary.
 

 Owens v. Owens,
 
 950 So.2d 202, 207(¶ 16) (Miss.Ct.App.2006). In
 
 Sellers v. Sellers,
 
 638 So.2d 481, 484 (Miss.1994) (quoting
 
 Mixon v. Bullard,
 
 217 So.2d 28, 30 (Miss.1968)), which we relied upon in
 
 C.W.L.,
 
 the supreme court stated that courts should try to keep siblings together if possible.
 

 ¶ 38. As in
 
 Owens,
 
 the chancellor properly considered each
 
 Albright
 
 factor and additionally considered whether it was in Jake’s best interest to be separated from his half-sister. The chancellor concluded from the testimony that there was a strong relationship between Jake and his half-sister and that any great reduction in his time with her would adversely impact Jake. Accordingly, we find no error in the chancellólas decision that this factor favored Melannie.
 

 ¶ 39. The chancellor noted that this was a difficult case to decide because both Steve and Melannie were good parents. After reviewing the evidence pertaining to the
 
 Albright
 
 factors, we agree that this was a close case. However, under our standard of review, we must affirm the chancellor’s custody decision because it was supported by substantial, credible evidence, and it was not clearly erroneous, manifestly wrong, or the result of the application of an erroneous legal standard. This issue is without merit.
 

 II. The Award of Joint Physical Custody
 

 ¶40. The chancellor determined that an award of joint physical and legal custody was in Jake’s best interest. The chancellor specified that Jake was to live with Melannie during the academic school year so Jake could attend the Pope School, and Steve was to have custody of Jake on alternating weekends and to pay child support to Melannie. However, during Jake’s summer vacation, Steve was to have custody, with Melannie to exercise custody on alternating weekends and to pay child support to Steve in June and July. Melannie was granted summertime custody of Jake during the week after school ended and the week before school began. Steve was granted custody of Jake each spring break and each Thanksgiving break. The parties annually alternated the custody of Jake on
 
 *692
 
 Thanksgiving Day; Jake’s Christmas break was roughly divided evenly between the parties.
 

 ¶41. Mississippi Code Annotated section 93 — 5—24(5)(c) (Rev.2004) provides that “ ‘joint physical custody’ means that each of the parents shall have significant periods of physical custody.” Steve argues that his custodial periods were too limited to fulfill the statutory requirement of “significant periods of physical custody.” Citing
 
 Rush v. Rush,
 
 932 So.2d 794, 799(¶ 18) (Miss.2006), Steve argues that the custodial arrangement constituted de facto sole physical custody to Melannie and standard visitation to him.
 

 ¶ 42. In
 
 Rush,
 
 the chancellor awarded joint legal and physical custody to the parents, with primary physical custody to the father and visitation for the mother.
 
 Id.
 
 at 796(¶ 7). The mother was to exercise her visitation on Tuesday nights, every other weekend, and at times recognized by the court as regular visitation, including extended periods in the summer, at Christmas, on other holidays, and at other times recognized by the chancery court as standard visitation.
 
 Id.
 
 at 799(1117). The chancellor provided no further information about the duration of the “extended periods.” The supreme court found the chancellor’s order to be contradictory because, while the chancellor found that it was in the child’s best interests for the parents to have joint legal and physical custody, he also specified that the father would have primary physical custody subject to the mother’s visitation.
 
 Id.
 
 at 800(¶ 21). Moreover, the supreme court held that the father had the lion’s share of the time with the child, and the mother’s custodial time fell “woefully short” of establishing that the mother was awarded joint physical custody under section 93-5-24.
 
 Id.
 
 at 799(¶ 18). The supreme court reversed the custody award and remanded it for clarification.
 
 Id.
 
 at 800(¶ 21).
 

 ¶ 43. Steve argues that the chancellor’s order was comparable to that in
 
 Rush
 
 and amounted to an award of liberal visitation, far short of what is required for joint physical custody. However, in
 
 Rush,
 
 the chancellor ordered visitation for the mother including undefined “extended periods” of time during the summer, on holidays, and at other times comparable to standard visitation. There was no express award of visitation in this case. Rather, the chancellor granted Steve physical custody during Jake’s summer vacation, except for the first and last week of his summer vacation, and during Jake’s spring break week and his Thanksgiving break. Melannie was to exercise her physical custody during Jake’s public school year, which by statute consists of one hundred and eighty days, or thirty-six weeks. Miss.Code Ann. § 37-13-63(1) (Rev.2007). Otherwise, the parties’ time with Jake, consisting of alternating weekends, Thanksgiving Day, and the Christmas holiday, was equally divided.
 

 ¶ 44. Joint physical custody does not requii'e equal time with each parent, but only requires that the parents have “significant periods of physical custody ... to assure a child of frequent and continuing contact with both parents.” Miss.Code Ann. § 93 — 5—24(5)(c). We find that the amount of custodial time awarded to Steve, while not generous, still afforded Steve significant periods of physical custody and assured Jake frequent and continuing contact with both Steve and Melannie. We cannot say that the chancellor exceeded his discretion in finding that Jake’s best interest demanded a joint physical custody arrangement, and one that permitted Jake to attend the Pope School. The chancellor’s decision that Jake should remain with Melannie during the school week was rea
 
 *693
 
 sonable because there was testimony that Jake’s grades suffered during the separation period when Steve and Melannie shuffled him back and forth between Hernando and Pope during the school week. We note that Steve’s custodial periods, including the summer months and spring break week, exceeded the custodial award in
 
 Rush
 
 that was found to be insufficient for joint physical custody. This issue is without merit.
 

 III. The Chancellor’s Consideration of the Guardian Ad Litem’s Testimony
 

 ¶ 45. Lastly, Steve claims that it was error for the chancellor to reject the concerns of the guardian ad litem without summarizing the guardian ad litem’s opinions and explaining why they were rejected. Steve appears to claim that the guardian ad litem favored granting him custody and that the chancellor should have paid more heed to the guardian ad litem’s concerns. Steve argues that pursuant to the holding in
 
 Floyd v. Floyd,
 
 949 So.2d 26, 29(¶ 8) (Miss.2007), the chancellor committed reversible error by neglecting to include a summary of the guardian ad litem’s recommendations with an explanation of his rejection of those recommendations. Relying on
 
 S.N.C. v. J.R.D.,
 
 755 So.2d 1077, 1082(¶ 18) (Miss.2000), the supreme court in
 
 Floyd
 
 held that “a chancellor shall at least include a summary review of the recommendations of the guardian in the court’s findings of fact when the appointment of a guardian is required by law.”
 
 Floyd,
 
 949 So.2d at 29(¶ 8). When the appointment of a guardian ad litem is not mandatory, this information is not required from the chancellor.
 
 Tanner v. Tanner,
 
 956 So.2d 1106, 1109(¶ 13) (Miss.Ct.App.2007).
 

 ¶ 46. Melannie argues that the appointment of a guardian ad litem was not mandatory. Under Mississippi Code Annotated section 93-5-23 (Supp.2008), the chancellor “may investigate, hear, and make a determination” when a charge of abuse or neglect arises in a child custody case, and in such cases shall appoint a guardian ad litem. Also, the chancellor may order an investigation by DHS. Miss. Code Ann. § 93-5-23. We have stated that section 93-5-23 gives the chancellor some discretion to determine whether there is a legitimate issue of abuse or neglect, even when one party has made such assertions in the pleadings.
 
 Johnson v. Johnson,
 
 872 So.2d 92, 94(¶ 8) (Miss.Ct.App.2004).
 

 ¶ 47. In
 
 Robison v. Lanford,
 
 841 So.2d 1119, 1126(¶ 23) (Miss.2003), the supreme court found that the appointment of a guardian ad litem was mandatory. In
 
 Ro-bison,
 
 there was documented evidence that a child’s buttocks were bruised after a parent-administered spanking, and there was an investigation by DHS.
 
 Id.
 
 at 1120-21(¶ 3). In this case, the chancellor appointed the guardian ad litem after Melan-nie made an allegation that Steve had abused Jake. This allegation was substantiated with photographs of bruises on Jake that were visible the day after Steve admittedly had spanked Jake. However, the chancellor did not order DHS to investigate, and there is no record of whether DHS opened a case file after having been contacted by Jake’s principal. The guardian ad litem testified that after an investigation, she found no evidence of abuse.
 

 ¶ 48. While discussing who was to pay the guardian ad litem fees, the chancellor stated that the appointment of the guardian ad litem was mandatory due to Melan-nie’s abuse allegations and the involvement of DHS. Assuming that the appointment of a guardian ad litem was mandatory, we find that the chancellor properly addressed the guardian ad litem’s findings. The guardian ad litem made no custody recommendation; the only recommendation that the guardian ad litem made to the court
 
 *694
 
 was that there were no grounds for finding any abuse of Jake. This was reflected in the chancellor’s divorce decree, which stated that there was insufficient proof of child abuse. The chancellor’s written findings on the
 
 Albright
 
 factors show that he accepted much of the guardian ad litem’s testimony pertaining to the
 
 Albright
 
 factors, but disagreed with some of that testimony as explained in the opinion.'
 
 [4]
 
 We find that the chancellor properly considered all of the evidence before the court in rendering the custody decision. This issue is without merit.
 

 ¶ 49. THE JUDGMENT OF THE CHANCERY COURT OF DESOTO COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
 

 [1]
 

 . Because there was an allegation of child abuse, this Court has used a fictitious name in place of the child's real name for the purpose of protecting his identity.
 

 [2]
 

 . No evidence surrounding the involvement of DHS appears in the record; there is no record of DHS opening a case. Melannie testified that she did not "think anything came up with DHS."
 

 [3]
 

 . The chancellor erroneously stated in the bench opinion that Steve worked “two days a
 
 week
 
 more” than Melannie. (Emphasis added). However, it appears that the chancellor was cognizant of the evidence that Steve worked two days per month more than Me-lannie, not two days per week more. This is because, in the next sentence, the chancellor stated: “Two days during their schedules. The testimony was, he worked ten and she worked eight.” The ten-day and eight-day schedules logically could not have been encompassed by a week.
 

 [4]
 

 . The chancellor disagreed with the guardian ad litem’s opinion that Jake's relationship with his half-sister inappropriately burdened Jake.